GEORGE W. CHIPMAN *vs.* ARTHUR D. McCLELLAN.

Middlesex.    March 30, 1893. — June 21, 1893.

TRADERS' NATIONAL BANK *vs.* GEORGE W. CHIPMAN
& another.

Suffolk.    March 30, 31, 1893. — June 21, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & LATHROP, JJ.

*Insolvent Debtor — Fraudulent Conveyance — Preference — Statute.*

At the trial of a writ of entry brought by the assignee in insolvency of the joint and several estates of A. and B., partners under the name of A. and Company, who were adjudged insolvent debtors on March 23, 1891, the tenant, a bank, claimed title under a deed from B., dated December 15, 1890, and delivered two days later. B., who was the father of A., furnished all the capital of the firm, and attended exclusively to its financial affairs. On October 16, 1890, he borrowed $12,500 of the bank, giving his own note indorsed by his firm, on one month's time. At the maturity of this note, a demand note was given for the same amount, signed and indorsed in the same manner. Payment of this note was demanded by the bank about December 10, 1890. On December 17, 1890, the demand note was delivered up to B. by the bank, and cancelled. B. paid the bank the interest then due, and indorsed on the note "New note, December 17, two months," the bank entering on its books the payment of the note; and at the same time another note for $12,500, on two months' time, dated December 17, 1890, was discounted by the bank for B. This note was signed and indorsed in the same way, and was secured by shares of stock of a mining company which had been given as security for the previous notes, and by the conveyance to the tenant of the demanded premises, the conveyance containing an agreement to reconvey on payment of the debt. When the conveyance was made, the liabilities of the firm were over $300,000 in excess of their assets. A. had no individual estate, and B.'s individual estate was less than $100,000. The firm owed on overdue notes $44,500, and notes to the amount of about $38,000 came due in December after the date of the conveyance. During the preceding ten years the firm had lost in speculations and paid out over $500,000 in excess of their profits. There was evidence that, on December 10, B. told the president of the bank that the affairs of the firm were terribly mixed up, and that it would be impossible to pay the note at that time; that he also told the president what property the firm had; and that the president then insisted on further security,

and the conveyance was made, and he made no further inquiry after that about the firm or B.    The president of the bank, who had had fifteen years' experience as a bank officer, testified that, in his experience as such officer, he did not recall an instance where a tradesman had conveyed a piece of land to a bank as security for a note held by the bank.    *Held,* that there was evidence for the jury on the following propositions :  1.  That at the time of the conveyance B. was insolvent or in contemplation of insolvency.  2.  That he made the conveyance with a view to give a preference to the bank.  3.  That the bank then had reasonable cause to believe B. to be insolvent, or in contemplation of insolvency.  4.  That the conveyance was in fraud of the laws relating to insolvency.

At the trial of a writ of entry brought by the assignee in insolvency of B. to recover land to which the tenant claimed title under a conveyance from B. about three months before he was adjudged an insolvent, the tenant requested the judge to instruct the jury that "the demandant must satisfy the jury by a fair preponderance of the evidence that B. was insolvent at the time of the conveyance ; and that, if at that time B. was able to meet his obligations as they came due in the ordinary course of business by resort to the means usual among business men, he was not then insolvent, and the verdict must be for the tenant."    The judge declined to give this ruling, and instructed the jury as follows :  " A trader is insolvent within the meaning of the statute when he is unable to pay his debts as they mature and become due and payable in the ordinary course of business, as persons carrying on trade usually do.    The test is not whether upon a postponement of the payment of the debts and a financial settlement of the trader's affairs there is property sufficient to pay them all ; that is not the test as applied with reference to an insolvent within the meaning of the statute.    It is whether the trader is able, as the debts mature and become payable and due, to pay them as traders usually do.    The statute does not contemplate that a person should have his property in such a condition that he can at any and all times pay his debts in lawful money, but he must be able to pay them as they become due, to meet them as business men usually do.    The fact that a person cannot pay without borrowing would not render such person insolvent within the meaning of the statute. provided the borrowing for the purpose of paying is in the ordinary course of business as persons in trade usually do.    But if, in order to pay a debt as it becomes due, a trader is obliged to transfer a large part of his assets as security for a loan by means of which he makes payment of that particular debt, at the same time leaving his other debts not provided for which are certain to become due, and not leaving sufficient assets in his hands to meet them when they become due and when he would have no right to expect that he would be able to meet them, such a payment would not be a payment in the ordinary course of business of persons carrying on trade."    In connection with another branch of the case, the judge used this language :  " If the demandant has satisfied you by a preponderance of the evidence that B. at the time of the conveyance was insolvent."    *Held,* that the tenant had no ground of exception.

On October 16, 1890, B., who was a member of a firm composed of A. and B., and had charge of its financial affairs, borrowed a certain sum of a bank, giving his own note therefor, indorsed by his firm on one month's time.    At the maturity of this note, a demand note was given for the same amount, signed and indorsed in the same manner.    Payment of this note was demanded by the bank about December 10, 1890.    On December 17, 1890, the demand note was delivered up to B. by the bank and cancelled.    B. paid the bank the interest then due, and indorsed on the note " New note, December 17, two months," the bank entering on its books the payment of the note ; and at the same time another note for the

same amount, on two months' time, dated December 17, 1890, was discounted by the bank for B. This note was signed and indorsed in the same way, and was secured by shares of stock of a corporation which had been given as security for the previous notes and by the conveyance of a parcel of land by B. to the bank, dated December 15, and delivered December 17, 1890. At that date the liabilities of the firm were over $300,000 in excess of their assets. A. had no individual estate, and B.'s individual estate was less than $100,000. On December 10, B. informed the president of the bank of the financial condition of the firm, and the latter then insisted on further security, and the conveyance was made. On March 23, 1891, A. and B. were adjudged insolvent debtors; and their assignee in insolvency brought a writ of entry against the bank to recover the land so conveyed by B. to the bank. The tenant requested the judge to rule that, upon the evidence, the conveyance from B. to the tenant was given to secure a contemporaneous and not a pre-existing debt, and that the demandant could not recover; and that if the note of December 17, 1890, was given and received in satisfaction of the demand note of November 18, 1890, and the latter note was thereupon surrendered and cancelled and the interest fully paid, the parties intending to substitute the new note for the old, that would constitute a payment of that note, and if this was done without fraud, and if the conveyance to the tenant was given and received as collateral to the note of December 17, then it was not given to secure a pre-existing debt or claim, and was not in contravention of the insolvent law. The judge declined so to rule, and, after giving full instructions to the jury as to the elements necessary to constitute a preference, instructed them that, if there was an agreement between B. and the bank that if B. would make the conveyance to the tenant as security for the two months' note the bank would loan to B. a sum of money sufficient in amount and for the purpose of paying the demand note, and he made the conveyance, received the money, and paid the demand note, such conveyance and payment by B. would be the same in legal effect as if the conveyance had been made directly to secure the demand note; that giving him credit was the same as paying him the money; that the question was whether the arrangement by which he raised the money and gave this conveyance was for the purpose of paying an existing debt, the demand note; that if that was the purpose, then it was a preference; and that, if all the other elements were proved, and the new arrangement was for the purpose of paying the demand note, the legal effect would be the same as though he made the conveyance for the payment of the demand note, and not of the two months' note. *Held*, that the tenant had no ground of exception.

The Pub. Sts. c. 157, §§ 96, 98, relating to preferences under the insolvency law, are not in conflict with the U. S. Rev. Sts. §§ 5136, 5137, defining the powers of a national bank, and authorizing it to hold real estate for certain defined purposes.

LATHROP, J. The first case is a writ of entry to recover possession of two parcels of land in Medford. The demandant is the assignee in insolvency of the joint and several estates of Dudley Hall and Dudley C. Hall, partners doing business under the name of Dudley Hall and Company, who were adjudged insolvent debtors on March 23, 1891. The tenant claims title under a deed from Dudley C. Hall, dated December 15, 1890, and delivered two days later. The tenant was at the time of the conveyance a director of and counsel for the Traders' National Bank, and the

consideration of the conveyance was an indebtedness from the firm of Dudley Hall and Company to the bank.

At the trial in the Superior Court, the demandant contended that the conveyance was a fraudulent preference, and in fraud of the insolvent law, under the Pub. Sts. c. 157, §§ 96, 98. The case was tried as if the conveyance had been made directly to the bank, and has been argued before us on this assumption, and we shall so consider it.

At the close of the testimony, the tenant asked the court to instruct the jury that, upon the whole evidence, the demandant was not entitled to recover. This request raises the question whether there was evidence for the jury on each of these propositions: 1. That at the time of the conveyance Dudley C. Hall was insolvent or in contemplation of insolvency. 2. That he made the conveyance with a view to give a preference to the Traders' National Bank. 3. That the bank then had reasonable cause to believe Hall to be insolvent, or in contemplation of insolvency. 4. That the conveyance was in fraud of the laws relating to insolvency. We are of opinion that there was evidence for the jury on all of these points.

Dudley C. Hall was the father of Dudley Hall, and was seventy-four years old. He furnished all the capital of the firm, and attended exclusively to its financial affairs. On October 16, 1890, he borrowed $12,500 of the Traders' National Bank, giving his own note, indorsed by his firm on one month's time. At the maturity of this note, a demand note was given for the same amount, signed and indorsed in the same manner. Payment of this note was demanded by the bank about December 10, 1890. On December 17, 1890, the demand note was delivered up to Hall by the bank, and cancelled. Hall paid the bank the interest then due, and indorsed on the note "New note, December 17, two months," the bank entering on its books the payment of the note; and at the same time another note for $12,500, on two months' time, dated December 17, 1890, was discounted by the bank for Hall. This note was signed and indorsed in the same way. It was secured by shares of stock of a mining company which had been given as security for the previous notes, and by the conveyance to the tenant of the two parcels of land in controversy in this action. The conveyance was in effect a mortgage, there being an agreement to reconvey on payment of the debt.

Although payment of the notes of the firm or of the individual members was not suspended until March, 1891, there was abundant evidence that the firm and its members were, when the conveyance was made, hopelessly insolvent. The liabilities of the firm were then over $300,000 in excess of their assets. Dudley Hall had no individual estate, and Dudley C. Hall's individual estate was less than $100,000, leaving an excess of liabilities over assets of more than $200,000. The firm owed on overdue notes $44,500 ; and notes to the amount of about $38,000 came due in December after the date of the conveyance. During the preceding ten years the firm had lost in speculations and paid out over $500,000 in excess of their profits.

Under these circumstances there can be no doubt that there was evidence that the firm and its members were insolvent. *Lee* v. *Kilburn*, 3 Gray, 594. *Peabody* v. *Knapp*, 153 Mass. 242, 244.

While the intent to prefer is essential and must be proved, the intent may be inferred from the fact that a preference is given. *Denny* v. *Dana*, 2 Cush. 160, 172. *Beals* v. *Clark*, 13 Gray, 18. *Sartwell* v. *North*, 144 Mass. 188, 192.

There was evidence that, on December 10, Dudley C. Hall told the president of the Traders' National Bank that the affairs of the firm were terribly mixed up and that it would be impossible to pay the note at that time; that he also told the president what property the firm had ; and that the president then insisted on further security, and the conveyance was made. He made no inquiry after that about Dudley Hall and Company or Dudley C. Hall. While this evidence was contradicted in some particulars, and while there was evidence in favor of the tenant's contention, it was for the jury to say what the facts were. The president of the bank had had fifteen years' experience as a bank officer; and he testified that in his experience as such officer he did not recall an instance where a tradesman had conveyed a piece of land to a bank as security for a note that the bank held. On the evidence, we are of opinion that it was competent for the jury to find that the president of the bank had reasonable cause to believe that Dudley C. Hall and his firm were insolvent, or in contemplation of insolvency. See *Forbes* v. *Howe*, 102 Mass. 427 ; *Merchants' National Bank* v. *Cook*, 95 U. S. 342.

The tenant further requested the court to instruct the jury that the demandant must satisfy the jury by a fair preponderance of

the evidence that Dudley C. Hall was insolvent at the time of the conveyance; and that, if at that time Dudley C. Hall was able to meet his obligations as they came due in the ordinary course of business by resort to the means usual among business men, he was not then insolvent, and the verdict must be for the tenant. The judge declined to give this ruling and instructed the jury as follows: " A trader is insolvent within the meaning of the statute when he is unable to pay his debts as they mature and become due and payable, in the ordinary course of business, as persons carrying on trade usually do. The test is not whether upon a postponement of the payment of the debts and a financial settlement of the trader's affairs there is property sufficient to pay them all; that is not the test as applied with reference to an insolvent within the meaning of the statute. It is whether the trader is able as the debts mature and become payable and due, to pay them as traders usually do. The statute does not contemplate that a person should have his property in such a condition that he can at any and all times pay his debts in lawful money, but he must be able to pay them as they become due, to meet them as business men usually do. The fact that a person cannot pay without borrowing would not render such person insolvent within the meaning of the statute, provided the borrowing for the purpose of paying is in the ordinary course of business as persons in trade usually do. But if, in order to pay a debt as it becomes due, a trader is obliged to transfer a large part of his assets as security for a loan by means of which he makes payment of that particular debt, at the same time leaving his other debts not provided for which are certain to become due, and not leaving sufficient assets in his hands to meet them when they become due and when he would have no right to expect that he would be able to meet them, such a payment would not be a payment in the ordinary course of business of persons carrying on trade."

The charge is not reported in full, and it does not appear that the judge did not fully instruct the jury as to the burden of proof; and in connection with another branch of the case it appears that the judge used this language: " If the demandant has satisfied you by a preponderance of the evidence that Hall at the time of the conveyance was insolvent," etc. We do not think that it is now open to the tenant to contend that the jury were not instructed that the burden of proof was on the demandant to show that Hall

was insolvent at the time of the conveyance. As to the rest of the instruction requested, we are of opinion that it was fully covered by the instructions given, and that these were correct. The jury might have been misled, if only the instruction requested had been given.

The tenant requested the court to rule that, upon the evidence, the conveyance from Hall to the tenant was given to secure a contemporaneous and not a pre-existing debt, and that the demandant could not recover. This request was rightly refused; and the question was properly submitted to the jury in connection with the next request, which was, in substance, that if the note of December 17, 1890, was given and received in satisfaction of the demand note of November 18, 1890, and the latter note was thereupon surrendered and cancelled, and the interest fully paid, the parties intending to substitute the new note for the old, that would constitute a payment of that note; and if this was done without fraud, and if the conveyance to the tenant was given and received as collateral to the note of December 17, then it was not given to secure a pre-existing debt or claim, and was not in contravention of the insolvent law.

The judge, after giving full instructions to the jury as to the elements necessary to be proved to constitute a preference, instructed them that, if there was an agreement between Hall and the bank that if Hall would make the conveyance to the tenant as security for the two months' note the bank would lend to Hall a sum of money sufficient in amount and for the purpose of paying the demand note, and he made the conveyance, received the money, and paid the demand note, such conveyance and payment by Hall would be the same in legal effect as if the conveyance had been made directly to secure the demand note; that giving him credit was the same as paying him the money; that the question was whether the arrangement by which he raised the money and gave this conveyance was for the purpose of paying an existing debt, the demand note, and if that was the purpose, then it was a preference; and that, if all the other elements were proved, and the new arrangement was for the purpose of paying the demand note, the legal effect would be the same as though he made the conveyance for the payment of the demand note, and not for the two months' note.

In our opinion the instruction requested did not meet the issues in the case, and the instructions given were correct. In *Crafts* v. *Belden*, 99 Mass. 535, it was said by Mr. Justice Foster, speaking of the provisions of the Gen. Sts. c. 118, §§ 89, 91, which correspond to the Pub. Sts. c. 157, §§ 96, 98: "The provisions of the statute are as broad and sweeping as possible, and are levelled against the most indirect and circuitous preferences." The law looks to the substance rather than the form, and if the intent of the parties was to prefer the bank, under the guise of a new note with new security, and the other elements exist, it is no less a preference than would have been the keeping of the old note alive and conveying the land as additional security.

The tenant further contends that, as the bank was a banking association incorporated and existing under the national banking act of the United States, the demandants are not entitled to recover, on the ground that the Pub. Sts. c. 157, §§ 96, 98, are in conflict with §§ 5136, 5137, of the U. S. Rev. Sts. These sections define the powers of a national bank. Under § 5136 it has the power to adopt and use a corporate seal, "to make contracts," "to sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons," to elect certain officers, to make by-laws, and to do a banking business. Section 5137 is as follows: "A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others: First. Such as shall be necessary for its immediate accommodation in the transaction of its business. Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted. Third. Such as shall be conveyed to it in satisfaction of debts, previously contracted in the course of its dealings. Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it."

An elaborate and able argument has been addressed to us, by the counsel for the plaintiff in the second case, in favor of the propositions that to receive such a conveyance as was made in this case is among the powers granted to national banks by the law of the United States; that such a conveyance is prohibited by the law of this Commonwealth; and that therefore the law of the State is inoperative and void as to a national bank, and the tenant has a good title to the land.

We do not accede to this view of the law; but regard the enumeration of the powers conferred upon national banks by the sections above cited as defining the extent and limitations of their powers in a general way. If they act in excess of their powers, no one but the government can complain. *National Bank v. Whitney*, 103 U. S. 99. *Reynolds* v. *Crawfordsville Bank*, 112 U. S. 405. If they act within the powers designated, the legality of their action is still to be determined. Thus § 5136 gives to national banks the power to make contracts. But it cannot be contended that they therefore have the power to make a contract which is illegal by the law of the State where the contract is made.

Indeed, as is said by Mr. Justice Miller in *National Bank* v. *Commonwealth*, 9 Wall. 353, 362, speaking of national banks : " They are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." See also *Waite* v. *Dowley*, 94 U. S. 527.

In *Leavenworth Bank* v. *Hunt*, 11 Wall. 391, the question of the validity of a mortgage to a national bank turned on the point whether it was recorded in accordance with a State law.

It is also to be noticed that, under § 5137, cl. 2, a national bank is authorized to hold real estate only when it is "mortgaged to it in good faith by way of security for debts previously contracted." The title of the bank to land must be determined by the law of the State in which the land is situated; and if a mortgage to it is not made in good faith by the State law, the bank gets no title. *Witters* v. *Sowles*, 32 Fed. Rep. 758.

We find nothing in the act of Congress which countenances the defendant's contention that Congress intended that a national bank should have power to acquire land in fraud of our insolvent law. In the first case the order must be,

*Exceptions overruled.*

THE SECOND CASE is a bill in equity, brought against the demandant and the tenant in the first case, and seeks to restrain

the first named defendant from the further prosecution of the first case, and to direct the other defendant to apply the parcels of land to the payment of the promissory note mentioned in that case. The ground of the proceeding is the contention which we last discussed in the first case; and as this has been decided against the contention of the bank, there is no ground for sustaining the present bill.

*Bill dismissed.*

W. B. *French*, for Chipman.

A. D. *McClellan, pro se.*

A. A. *Strout*, (W. H. *Coolidge* with him,) for the Traders' National Bank.