## In re VIRGINIA HARDWOOD MFG. CO.

(District Court, W. D. Arkansas, Fort Smith Division. July 17, 1905.)

1. BANKRUPTCY—PREFERENCES—VACATION—INSOLVENCY—NOTICE.

Under Bankr. Act July 1, 1898, c. 541, §§ 60a, 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], defining a preference, and providing that if a bankrupt shall have given a preference, and the person receiving it shall have had reasonable cause to believe that it was so intended, it shall be voidable by the trustee, etc., it is not necessary, in order to entitle the trustee to recover a preference, that the preferred creditor should have in fact believed, when he took the preference, that the debtor was insolvent, or that he had reasonable cause so to believe at that time, but it is sufficient that the facts and circumstances with reference to the debtors' financial condition brought home to the creditor were such as would put an ordinarily prudent business man on inquiry, which, if pursued, would lead to knowledge of the debtor's insolvency.

139 F.—14

**2. SAME—EVIDENCE.**

In a suit by a bankrupt's trustee to recover preference, evidence *held* to establish that a preferred creditor at the time the mortgage constituting the preference was executed had reasonable cause to believe that the debtor was insolvent and that the mortgage was intended as a preference.

In Bankruptcy. On review, upon petition of W. R. Abbott, of the action of Referee L. H. Southmayd in disallowing his claim, upon objections of W. J. Fleming, trustee, as a preferred claim against the Virginia Hardwood Manufacturing Company, bankrupt.

Brizzolara & Fitzhugh, for petitioner.

C. E. Warner and A. A. McDonald, for trustee in bankruptcy.

ROGERS, District Judge. The claim of W. R. Abbott is based upon a judgment of foreclosure of a mortgage in the state court, and no objection is made as to the form of the proof, or as to the amount of the judgment. The objections of the trustee are as follows:

(1) That the mortgage given by the bankrupt herein was given within four months preceding date of filing petition to secure the payment of an antecedent or subsisting debt, said bankrupt being insolvent at the time of the execution and delivery of said mortgage, and same is therefore void as to creditors, and a preference.

(2) That said mortgage was executed and delivered by the bankrupt while insolvent, and within four months of date of filing petition, and was so executed and delivered for the purpose of hindering, delaying, and defrauding creditors, and is therefore void, and a preference, under the bankrupt law.

(3) That said mortgage is invalid, and therefore void, and a fraud as to other creditors, for the reason that the same was not legally executed and delivered, and for the further reason that same was withheld from record.

Section 60, pars. "a," "b," of the bankrupt law, approved July 1, 1898 (30 Stat. 562, c. 541 [U. S. Comp. St. 1901, p. 3445], as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 [U. S. Comp. St. Supp. 1903, p. 416]), is as follows:

(a) A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required.

(b) If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person. And, for the purpose of such recovery, any court of bankruptcy, as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction.

The mortgage in controversy was executed on the 26th of January, 1905, and withheld from record until the 13th of February, 1905. A petition in bankruptcy was filed against the bankrupt on the 5th of April, 1905, and on the 17th of May, 1905, it was ad-

judicated a bankrupt upon a trial before the court, in which the American National Bank, of which the present claimant is president, resisted the adjudication on the ground that the bankrupt was not insolvent at the time the mortgage was executed or at the time the petition was filed. The judgment on which this claim is based was recovered on the 8th day of May, 1905, three days after the petition in bankruptcy was filed. It must be taken, therefore, as res adjudicata that the bankrupt was insolvent when the mortgage was executed. The question of the insolvency, therefore, of the bankrupt, is eliminated, or practically not in controversy. The question to be determined is whether under section 60, pars. "a," "b," of the bankrupt law, supra, the mortgage in this case is voidable because a preference. Paragraphs "a" and "b" of section 60 were construed by the Supreme Court of the United States in Pirie v. Chicago Title and Trust Company, 182 U. S. 446, 21 Sup. Ct. 909, 45 L. Ed. 1171, as follows:

"Subdivisions 'a' and 'b' are concerned with a preference given by a debtor to his creditor. Subdivision 'a' defines what shall constitute it, and subdivision 'b' states a consequence of it—gives a remedy against it. The former defines it to be a transfer of property which will enable him to whom the transfer is made to obtain a greater percentage of his debt than other creditors. The latter provides a consequence to be that the transfer may be avoided by the trustee, and the property or its value recovered, provided, however, that the preference was given four months before the filing of the petition in bankruptcy or before the adjudication, and the creditor had reason to believe a preference was intended."

At the argument reliance was placed on sections 57g, 67e, of the bankrupt law (Act July 1, 1898, c. 541, 30 Stat. 560, 564 [U. S. Comp. St. 1901, pp. 3443, 3449]). It may be well to say that in the same case those sections are construed, and the question disposed of, so far as this case is concerned. See pages 445 and 449 of 182 U. S., pages 909, 910 of 21 Sup. Ct. (45 L. Ed. 1171). It will not be necessary to notice these sections further. The question presented in this case therefore must depend upon the construction to be placed on section 60, pars. "a," "b," as applied to the facts of this case. Under section 67b, by the very terms of the act, where a creditor who received a preference under the act "had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person." This language has been repeatedly construed by the courts, and it may be noticed that they hold that the question is not what the creditor in fact believed when he took the preference, nor yet what he had reasonable cause to believe at that time, "but it is enough to constitute a reasonable cause to believe him insolvent that the facts and circumstances with reference to the debtor's financial condition which are brought home to the creditor are such as would put an ordinarily prudent man upon inquiry, which, if pursued, would lead to knowledge of insolvency. In re Eggert, 4 Am. Bankr. Rep. 449, 102 Fed. 735, 43 C. C. A. 1; In re Beerman (D. C.) 7 Am. Bankr. Rep. 431, 112 Fed. 663. Cases under state insolvency statutes are not strictly in point, because the language of the statutes may not be the same as the federal bank-

ruptcy act; and yet the following cases, and those cited in the opinions therein, are suggestive illustrations of what is sufficient to put a creditor upon inquiry as to the probable insolvency of his debtor: Matthews v. Chaboya, 111 Cal. 435, 44 Pac. 169; Read v. Moody, 60 Vt. 668, 15 Atl. 345; Chipman v. McClellen, 159 Mass. 363, 34 N. E. 379; Holcombe v. Ehrmanntraut, 46 Minn. 397, 49 N. W. 191." Bardes v. First National Bank, 12 Am. Bankr. Rep. 775, 98 N. W. 285. In Hackney v. Raymond Bros. Clarke Co., 10 Am. Bankr. Rep. 217, 94 N. W. 822, in reviewing the cases on this point, it is said:

"Whether a creditor had reasonable cause to believe his debtor insolvent within the purview of section 60 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), is a question of fact. In re Eggert, 4 Am. Bankr. Rep. 449, 102 Fed. 735, 43 C. C. A. 1. In determining this question it is not necessary to find that the creditor actually knew or believed that the debtor was insolvent. He is chargeable with notice of such facts as a reasonable inquiry, in view of the circumstances with respect to the debtor's condition which were brought home to him, might fairly be expected to disclose. In re Eggert, supra. But a mere knowledge that the debtor has other liabilities, or of circumstances which could operate no further than to create a suspicion of possible insolvency, is not always sufficient. In the Eggert Case the Circuit Court of Appeals says: 'The resultant of all these decisions we take to be this: That the creditor is not to be charged with knowledge of his debtor's financial condition from mere nonpayment of his debt, or from circumstances which give rise to mere suspicion in his mind of possible insolvency; that it is not essential that the creditor shall have actual knowledge of, or belief in, his debtor's insolvency, but that he should have reasonable cause to believe his debtor to be insolvent; that if facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose.' "

Benedict v. Deshell, 11 Am. Bankr. Rep. 20, 68 N. E. 999; In re Eggert, 4 Am. Bankr. Rep. 447, 102 Fed. 735, 43 C. C. A. 1; George W. Crooks, Trustee, etc., v. People's Bank of Malone, 3 Am. Bankr. Rep. 238, 61 N. Y. S. 604; Western Tie & Timber Company v. Brown, 12 Am. Bankr. Rep. 114, 129 Fed. 728, 64 C. C. A. 256; In re Carl F. and Ernest A. Ebbert, 1 Am. Bankr. Rep. 340; In re Philip Jacobs, 1 Am. Bankr. Rep. 518.

In a note to this last case, supported by many citations, the author states the principle thus:

"The question for determination, if an action is brought to invalidate the transfer, is not whether the transferee had actual knowledge, or even actual belief, of the intent to give a preference, but whether the transferee, as a business man, acting with ordinary prudence, sagacity, and discretion, had reasonable cause to believe that the debtor was insolvent, and that by the transfer he intended to give an advantage to one creditor over the others."

A review of the decided cases does not disclose any conflict as to the correct interpretation of section 60, pars. "a," "b," nor was there any contention at the argument that the principles announced above are not sound. The real controversy grows out of the application of these principles to the facts in the case. I therefore turn my attention to the evidence to ascertain whether the claimant, at the time his mortgage was executed, either knew, or had reasonable cause to believe, that the bankrupt was insolvent, and that in

taking his mortgage he knew, or had reasonable cause to believe, that it was intended thereby to give a preference.

The Virginia Hardwood Manufacturing Company is a New York corporation. It had been doing business in Virginia. Its Virginia plant was removed to Ft. Smith early in 1904. Mr. Abbott, the claimant (who was then and is now the president of the American National Bank), testifies that his bank began business with the corporation in February, 1904, and continued business with it until it went into the hands of a receiver some time in the spring of 1905. Its plant consisted of some secondhand machinery which the company estimated at $21,000. From the very first the claimant became conversant with its business. He says himself that before the bankrupt opened an account with the American National Bank (of which he was president) it made arrangements therefor with him, and that he advised himself, as far as he was able to do so, of its condition and prospects, with a view of determining whether the bank wanted its account; that his inquiries were not confined to the statements of its officers, but were extended to whatever other information he could get. From the very first the chairman of the discount board of the bank, and its vice president, Mr. Boone, was opposed to opening an account with the company. He so testifies, but says that Mr. Abbott favored it, and as the result the entire dealing with the company was turned over to Abbott. Abbott himself swears that the first credit given to the corporation by the bank was $10,000, and that he was the indorser. The bankrupt was not then known at Ft. Smith. It was a new concern there, and it may be fairly assumed had no credit then, and would not have gotten the first loan of $10,000 had not Abbott indorsed for it; and it may be also fairly assumed that it was for this reason the dealings of the bank with the bankrupt were turned over to Abbott to control and manage. On the 26th of January, 1905, a line of credit had been extended to the company for about $50,000, and Abbott was indorser on all the paper. Mr. Boone, chairman of the discount board of the bank, swears that no loans to the bankrupt came to him for approval until about the time the mortgage was given on January 26, 1905; that he had occasionally inquired of the account of the bankrupt, and the cashier, Mr. Ball, had advised him that Abbott was guarantying everything, until the credit extended reached a certain amount (presumably, judging from his evidence, when the amount had reached about $50,000), when he and another member of the discount board of the bank told the bankrupt's officers that the line of credit "had to stop right then and there." They no doubt had concluded at that time that the bank, Abbott, and the bankrupt had all reached a limit on the credits to that concern. Boone then says the next thing he knew "Abbott had taken this mortgage and taken the notes of these people in lieu of the bank notes for the debt." I infer that he means by this language that Abbott relieved the bank of the bankrupt's paper on which he was indorser by substituting his own, or assuming the bankrupt's debt; and, in order to secure himself, took the mortgage in controversy, which covers their entire plant and nearly all their assets. It is

apposite to the conditions existing at the time the mortgage was given to notice the testimony of the claimant, Mr. Abbott, who, in explaining why the mortgage was given, swears: "I was away nearly all the fore part of January, 1905, and while I was gone the bank let the Virginia Hardwood Manufacturing Company have something more than ten thousand dollars more than I had authorized, and when I came back and found out that they had let them have it then I asked for the mortgage." So it appears that Mr. Abbott had himself limited the credit of the bankrupt in the early part of January, 1905, at a sum $10,000 less than the debt was on January 26th, when the mortgage was taken, and because of the unauthorized loan of $10,000 by the bank in his absence (he being the indorser) he asked for the mortgage. But he swears more. He says the bankrupt was, a day or two before the mortgage was given, asking for additional credit. "I decided if they would give me a mortgage that we would go on and try to help them. * * * They represented that they could pay ten thousand dollars in 20 days by the sale of certain lumber to the Drew Hardwood Company in St. Louis, and that they would allow Mr. Fleming to go there and O. K. all checks for me that I might wish, so that I might know they were spending this money properly." In another place he swears that: "I told them when they gave that mortgage that I would put a man in charge of it to represent me—Mr. Fleming— which I did, so I would know what was going on, and I would follow them along a month or so, and see what they were doing, and see if they were earning any money." The mortgage was taken under the following circumstances: The bankrupt had overdrawn more than $10,000 beyond what Mr. Abbott had authorized, and for which he was indorser. He therefore asked for a mortgage, and to put a man in the plant to check up its business and represent him. Moreover, on January 1, 1905, the bankrupt had furnished Abbott and the bank what purported to be a statement of assets and liabilities, which showed that the company owed $13,518.78 to other creditors than the bank, which is a sum far in excess of their assets not covered by the mortgage, and Abbott was advised at the time the mortgage was given that no relative change between assets and liabilities had occurred since the statement was made out. It is true this statement showed an excess of assets over liabilities of nearly $45,000. That this statement of assets was padded and false there can be no doubt, and that it was known to McNeill and Hodder, the president and secretary of the bankrupt, there can be no doubt. As to whether Abbott knew it was false at that time will now be considered. He knew that his mortgage covered so much of the assets that what was left was totally insufficient to pay the other creditors listed on the statement. If he really believed that the bankrupt had (as the statement shows) assets amounting to $104,288.80, and that he was taking practically all of it, and excluding creditors (as the statement shows) who held claims aggregating $13,518.78, he knew that he was getting security far in excess of his claim, and that the effect of it was to hinder and delay the other creditors. He must also be held to have known

that such a transaction of itself invited attack, and imperiled the validity of his mortgage, and tended to defeat the very object he wished to attain, viz., valid security for his debt.

In Savings Bank v. Jewelry Company et al., 12 Am. Bankr. Rep. 785, 99 N. W. 123, the court said:

"That the execution by a debtor of a mortgage covering all his property, in favor of one of several existing creditors, is evidence of an intention to prefer such creditor, may well be supposed. But such is not conclusive upon the question. A preference such as offends the bankruptcy act must be one likely in its results to defeat the collection by other creditors of their claims. Essential to such a preference, therefore, is insolvency; because if the debtor was solvent the execution of the mortgage would not, in all likelihood, operate to defeat the other creditors of the mortgagor. Knowledge or a reasonable cause to believe that a preference is intended involves, therefore, knowledge or a reasonable cause to believe that insolvency exists as a matter of fact."

The same rule is true where a single creditor, with a knowledge of the insolvency of its debtor, takes a mortgage upon substantially all of its assets with the knowledge at the time (as will appear later) that there were outstanding creditors of nearly $40,000, which was the situation in the case at bar when this mortgage was taken. Pollock v. Jones, 10 Am. Bankr. Rep. 616, 124 Fed. 163, 61 C. C. A. 555.

In this connection it must not be forgotten that Abbott swears that he knew that the statement was intended to show the cost of the assets. He also swears that he took the mortgage to secure his debt, because a good many statements regarding their business that they (Hodder and McNeill) had recently made to him proved to be false, and states one instance in regard to what they represented about the purchase of an iron safe in which to keep their books and papers, as required by their insurance policies. Thus it appears that he did not rely absolutely upon statements made by Hodder and McNeill. On the other hand, both Hodder and McNeill, the secretary and president of the company, who were its active and sole managers, swear that from the first they consulted Abbott about what they did, and that he was conversant with the condition of the company all the time. Hodder swears as follows:

"Q. You did talk to Mr. Abbott about the condition of the company, did you? A. Yes, very often. Q. Did you represent that the corporation was in good condition? A. I don't think I did. I don't think I represented anything to Mr. Abbott. He knew as well as I did, and knew every transaction himself. We consulted with him on every subject from the first day we came here. He had really more interest than anybody. Q. I ask you how many times did you consult with Mr. Abbott about the condition of this corporation during the fall and winter of 1904? A. Very nearly every day."

Mr. Abbott was asked:

"Q. What opportunities, if any, did you have for knowing the condition of that business, and who was looking after it? A. Of their business? Q. Yes, sir. A. I had their statements for it, and personal observation."

Abbott does not deny any of these statements in reference to his familiarity with the condition of the business of the Virginia Hardwood Manufacturing Company. For the purposes of this case it stands admitted that he was just as familiar with its condition as McNeill and Hodder. Moreover, there appear in the statement it-

self three items—real estate, buildings, and machinery—aggregating $85,453.09, the value of which Mr. Abbott was just as capable of fixing as Hodder and McNeill; and he must have known that these three items were very greatly overvalued. It ought not to be forgotten in this connection that McNeill testifies that this statement was gotten up for a dual purpose. He says there was a plan on foot to organize another company, with the expectation of selling to them the properties of the Virginia Hardwood Manufacturing Company, and that one of the objects of the statement was that it might be used in making the sale. He says that when the statement was requested Mr. Abbott told him to boost the Virginia Hardware Manufacturing Company (hereafter called "Virginia Company") so that the assets of the Virginia Company would be recognized to their full value in the assets of the new company, and that this company afterwards transpired to be the Ft. Smith Hardwood Manufacturing Company (hereafter called the "Arkansas Company"), in which Mr. Abbott was a stockholder; and that Abbott always maintained that in making that sale he wanted to get the Virginia Company full value. This statement is not denied by Mr. Abbott. I conclude, therefore, that Mr. Abbott was not deceived by the nature or character of this statement, and that, as tesified to by McNeill and Hodder, he knew as much about the values of the properties of the Virginia Company as McNeill and Hodder themselves. It must not be forgotten that it was agreed between Abbott, Hodder, and McNeill, before the mortgage was executed, that it should not go upon record at that time. They differ as to the reasons why the mortgage should not be placed on record. Hodder swears that the bank telephoned to the factory for either he or McNeill to come in, and he called on Mr. Abbott at the bank, and that Abbott claimed that the bank inspectors were coming the next day, and that the bank had loaned more money to the Virginia Company than they were authorized to loan under the national banking laws, and he did not want to get into any trouble about it, and after some further conversation asked for the mortgage. Hodder says he told him he would confer with McNeill, and supposed it would be all right; that Abbott said he would not record the mortgage, and he said it would be a protection to us (the Virginia Company) against any other creditors, if they should make trouble for us; that the whole thing would be a matter of form, and was to save the bank on account of the inspector. Abbott denies that he said he would take the mortgage for the purpose of keeping other creditors off, or for the purpose of keeping other creditors from jumping on the bankrupt, and says that he withheld the mortgage from record in order that he might not destroy the bankrupt's negotiations with the Arkansas Company during that time. McNeill swears that he objected to giving the mortgage because it would affect the credit of the company, and Abbott said, "No, it would not be brought out, because, if this mortgage is given, it will not be recorded except in the event of your being pounced upon by other creditors." Both McNeill and Hodder testify that Abbott insisted that the mortgage should be given and completed that night, and

that they went to Mr. Brizzolara's office for that purpose, and that the mortgage was prepared and executed that night. Abbott does not deny this, and it will be remembered that at this very time, according to Abbott's own statement, negotiations were pending between the Virginia Company and the Arkansas Company for the sale of the Virginia Company's plant, which he did not want to disturb, and for that reason he claims that he withheld the mortgage from record. The reasons assigned for withholding the mortgage from record are not inconsistent, are both plausible, and the conclusion reached is that they are both true. Abbott wanted the mortgage because there was a chance, at least, that it might be the means of his saving his debt. He did not want it to appear, doubtless, to the examiner, that he had loaned to one concern $50,000 of the bank's money; and he did not want the mortgage to go upon record because negotiations were pending for the sale of the Virginia Company's plant to the Arkansas Company. One thing is certain: Abbott was more interested in the Virginia Company than everybody else concerned. That company owed him more than it did all the other creditors, and he held in trust, as will be seen later, all of its capital stock, and had a mortgage on substantially all of its assets. He practically owned the company, although the stock stood on the books of the company in the name of Hodder. Abbott says he was also a stockholder in the Arkansas Company, which was negotiating for the purchase of the Virginia Company's plant and properties. He says he suggested to Hodder and McNeill to sell the Virginia Company's properties to the Arkansas Company, and that Hodder asked him to represent him (Hodder) in making the sale, and that he was conducting the negotiations for Hodder for the sale of the Virginia Company's plant and properties to the Arkansas Company. The real fact is the Virginia Company's plant and properties practically belonged to Abbott, and he was negotiating the sale primarily for himself. He was therefore directly interested, both as seller and buyer. If he was not familiar with the condition and property of the seller, he was in no situation to serve the Virginia Company and himself faithfully and successfully; if he was familiar with it, he knew it was insolvent, and that the statement rendered by the Virginia Company on the 1st day of January, 1905, was grossly incorrect. Whatever may be said about that, surely Abbott occupied an important vantage ground to serve his own interest. If he made the sale for a sum large enough to pay off the debts of the Virginia Company, including his own, the effect would be to save the $50,800 loaned to the Virginia Hardwood Manufacturing Company by the bank, which he had assumed, and at the same time he became a stockholder of the Arkansas Company on equal terms with his brother stockholders. He says he influenced the stockholders of the Arkansas Company, after their first offer of $78,000 was made and rejected, to renew it by making an offer of $75,000, to which he added a discount of his own debt of $3,000, in order to effect the sale. He could well afford to lose the $3,000 if he could save the $50,800 which the Virginia Company owed him. But if he was unfamiliar with the

Virginia Company's plant and properties he was acting unfairly in inducing his brother stockholders to make an offer of that sum for it. He owed his associates the best of faith. If he was familiar with the Virginia Company's plant and properties, he must have known that they were not worth $78,000. The trouble was Mr. Abbott occupied a confidential relation with both the buyer and seller. He was trying to serve two masters. We are told, upon the highest authority, that no man can serve two masters. His motive was to save himself. It was a strong motive, and a great temptation. The struggle was to avoid the loss incident to the bankruptcy of the, Virginia Company, which would inevitably result in an attack upon his mortgage, which was practically the only security he held for the debt of $50,800. It is believed that no one can carefully read and analyze the testimony in this case without reaching the irresistible conclusion that Mr. Abbott knew as much about the plant and properties of the Virginia Company as its officers, and, knowing it, he must have known that the company was insolvent when he took the mortgage. To conclude otherwise is to decide that throughout this transaction he was acting in the most reckless and incompetent manner in the management of both his personal affairs and the affairs of both companies. But the motive then to make the sale and save his debt was no greater than the temptation now to uphold the validity of the mortgage by making it appear that he did not know or believe that the bankrupt was insolvent when the mortgage was given.

So far the discussion has proceeded upon the theory that the only creditors of the bankrupt were those tabulated in the statement of January 1, 1905, furnished to Abbott by the officers of the Virginia Company. But there is another claim against the Virginia Company brought to light in such a way as to make it more significant than the mere existence of the claim itself. In the summer of 1904, Hodder and McNeill quarreled over a claim of Hodder's against the Virginia Company for $25,000. From their statements there was no dispute as to the amount of the claim, for it was evidenced by promissory notes. The controversy was whether Hodder should hold the claim against the company and compel its payment before McNeill should have certain stocks of the Virginia Company held by Hodder under an agreement previously made between McNeill and himself. They referred this matter of dispute between them for settlement to their mutual friend, Mr. Abbott, who decided it in favor of Hodder. Both Hodder and McNeill say it was a debt of the Virginia Company. Abbott says they represented to him it was McNeill's debt to Hodder, and not the company's debt. Abbott further says he never heard of this Hodder debt against the company till March, 1905. McNeill and Hodder say he was told of it repeatedly before and after the arbitration referred to. However that may be, when Abbott decided the matter they agreed upon a settlement of it, and agreed that the settlement should be reduced to writing. The terms having been agreed on in the American National Bank, Abbott called Ball, the cashier, and stated the terms thereof to him in the presence of both Hodder and

McNeill, and directed the cashier to go with them to Mr. Brizzolara's office and have it put in shape and signed by the parties. Ball, accompanied by Hodder and McNeill, went to the office of Mr. Brizzolara, who is an attorney, and Ball stated the terms of the settlement to him in the presence of both Hodder and McNeill. While there Hodder and McNeill got into another heated wrangle. Ball says he took Brizzolara into another room and stated the terms to him again and left. The instrument was drawn by Brizzolara and executed that day by Hodder and McNeill. They both say that Brizzolara did that. When the paper was executed it was taken over to the bank and given to Ball, who took charge of its custody. Ball and Abbott both say they never read the paper. Abbott says that he never acted under it, although it was provided in it, as will be seen later, that he should be a trustee. He says that he did not know it was in the bank until March, 1905, when the differences sprang up between the bank and himself and Hodder and McNeill. The cashier, Ball, knew, however, that it was there all the time. Hodder swears that a few days after it was executed he called on Abbott for a copy of it, and a typewritten copy was made out in the bank and given to him, which copy he produced in evidence on the trial. Abbott denies that Hodder ever called on him for a copy, or that he knew it was in the bank. That instrument is as follows:

"Whereas the Virginia Hardwood Manufacturing Company, a corporation organized under the laws of New York, is indebted to the American National Bank in the sum of seventeen thousand five hundred forty nine and $^{79}/_{100}$ dollars evidenced by its several promissory notes as follows, to wit: $600.00 due July 11th 04; $2000.00 due July 14th 04; $1500.00 due September 15th 4; $1000.00 due Aug 24th 4; $3000.00 due Aug 31st 04; $2500.00 due July 26th, 04; $3500.00 due Sep 15th 04; $3449.79 due Oct 21 04, which notes amount in the aggregate to the sum of seventeen thousand five hundred & forty nine $^{79}/_{100}$ dollars.

"And whereas some of the aforesaid notes are now past due and it is desired to renew the same.

"And whereas the American National Bank has required further and other security for the renewal of the same, and further security upon any and all other notes now in the hands of the aforesaid bank being demanded, and

"Whereas W. R. Abbott, to secure the renewal of the notes past due, and to further secure any and all other notes now in the hands of the aforesaid bank of the said corporation, W. R. Abbott has become an accommodation endorser thereon.

"Now, for and in consideration of the aforesaid W. R. Abbott endorsing each and every one of the aforesaid notes, we, John Hodder, of New York city, New York, and Angus McNeill, of Fort Smith, Arkansas, do hereby agree, bind and obligate ourselves to assign and deliver unto the said W. R. Abbott all the stock belonging to us of the aforesaid Virginia Hardwood Manufacturing Company, as security, and to protect the aforesaid W. R. Abbott and the American National Bank of Fort Smith, Arkansas, in the prompt and due payment of each and every note aforesaid.

"And the aforesaid parties also agree, bind and obligate themselves to assign and deliver to the American National Bank as collateral security for the due and prompt payment of any and all sums that may be due and owing to the American National Bank one half of the capital stock of the Fort Smith Hardwood Manufacturing Company, which shall amount and be of the sum of $75000.00, a corporation which is to be incorporated under the laws of the state of Arkansas on or before the first day of September, 1904, in lieu of and in place of the stock aforesaid of the Virginia Hardwood Manufacturing Com-

pany, so assigned and delivered by the said John Hodder and Angus McNeill.

"The aforesaid stock of the Virginia Hardwood Manufacturing Co. so assigned and transferred as aforesaid, in addition to its being collateral security for any and all indebtedness that may be due and owing the American National Bank shall also be and remain in the hands of the said W. R. Abbott, as trustee in trust for the use and benefit of John Hodder, to secure the prompt payment of any and all indebtedness due him and Miss Jane Hodder on certain demand notes of the Virginia Hardwood Manufacturing Co. after any and all indebtedness due the American National Bank shall have been fully paid and satisfied.

"And it is distinctly understood by all parties hereto that the indebtedness to the American National Bank on the one-half of the capital stock of the Fort Smith Hardwood Manufacturing Company shall at no time exceed the sum of twenty thousand dollars without the written consent of both John Hodder and Angus McNeill.

"It is further agreed and stipulated that none of the stock of the Fort Smith Hardwood Manufacturing Company unsold which is held in the treasury shall be sold except for cash only, which shall be used in the business of said corporation and in payment of its indebtedness to the American National Bank, which indebtedness shall not exceed twenty thousand dollars unless as herein otherwise provided.

"In Witness Whereof we have hereunto set our hands this the 23rd day of July, 1904.                                                                 Angus McNeill.
                                                                                             "John Hodder."

It will be observed that the first "whereas" in this instrument is a recitation of the fact that the Virginia Company was indebted to the bank in the sum of $17,549.79, evidenced by certain notes, which are described. The second "whereas" recites the fact that those notes are now past due, and that the Virginia Company desire to renew. The third "whereas" recites that the American National Bank require "further and other security" for the renewal of the same, and further security on any other notes of the Virginia Company now held by the bank. The fourth "whereas" recites that to secure the renewal of the notes past due, "and to further secure any and all other notes" of the Virginia Company now in the hands of the bank, that Abbott had become the accommodation indorser. It will be remembered that when this instrument of writing was drawn, according to Mr. Abbott's testimony, he was already indorser upon all the indebtedness of the Virginia Company to the bank. Indeed, he was indorser from the time they made the first loan of $10,000. The third "whereas" makes it appear that, notwithstanding that fact, when debts were past due and were to be renewed the bank was at that time demanding further and other security for the renewal of the notes. So that as early as July 23, 1904, the bank was seeking other security than the indorsement of Abbott, and this with the knowledge of Abbott—indeed, at his instance, because it will be remembered that neither Abbott nor Ball denies that they authorized the provisions to which I have just referred to be inserted in this instrument of writing. The fifth paragraph of this writing provides a remedy, which is that in consideration of the conditions theretofore referred to that Hodder and McNeill bound and obligated themselves to assign and deliver to Abbott all the stock belonging to the Virginia Company as security to protect Abbott and the American National Bank in the payment of the notes previously described in the instrument and

any other moneys that might be advanced by the bank. The sixth paragraph of this instrument provides for the organization of a new company, to be known as the Ft. Smith Hardwood Manufacturing Company (which, as we shall see, was subsequently done); and it further provides that when that is done the stock shall be assigned and delivered to the American National Bank as collateral security for the payment of any sum due and owing to the American National Bank by the Virginia Company in lieu of and in place of the stock of the Virginia Company so assigned and delivered by Hodder and McNeill. This sixth paragraph, it will be seen, referred wholly to a company thereafter to be organized. The seventh paragraph is the one to which special attention is now called. It provides:

"The aforesaid stock of the Virginia Hardwood Manufacturing Company so assigned and transferred as aforesaid, in addition to its being collateral security for any and all indebtedness that may be due and owing the American National Bank shall also be and remain in the hands of the said W. R. Abbott as trustee in trust for the use and benefit of John Hodder, to secure the prompt payment of any and all indebtedness due him and Miss Jane Hodder on certain demand notes of the Virginia Hardwood Manufacturing Company, after any and all indebtedness due the American National Bank shall have been fully paid and satisfied."

Ball and Abbott both testify that the latter part of this provision, providing that Abbott should hold this stock in trust to secure the indebtedness due John Hodder and Jane Hodder evidenced by certain demand notes of the Virginia Company, was not authorized by them to be inserted in this instrument, and Abbott swears that he never heard that John Hodder and Jane Hodder had any claim against the Virginia Company. How did it happen, then, that this clause was inserted in this instrument? The proof is positive and uncontradicted that neither Hodder nor McNeill directed it to be done. Ball says that he did not direct it to be done. If the testimony of Hodder and McNeill and Ball and Abbott on this point be true, it must therefore have been inserted without authority by either Mr. Brizzolara or his stenographer. No one else had anything to do with the preparation of that instrument. It is a significant fact that neither the stenographer, nor Brizzolara, who prepared the instrument of writing, were called as witnesses by Mr. Abbott. It was in his power to have called these witnesses, and, if this provision was inserted in that instrument without the authority of any one by Brizzolara or his stenographer, it could have been shown. But is it reasonable that an attorney who is not shown to have known anything about the terms which had been agreed upon as to the settlement between McNeill and Hodder except what he had received from Ball, would, of his own accord, have inserted into this instrument of writing a provision adjusting the differences between Hodder and McNeill in exact accordance with what both McNeill and Hodder now say was the settlement made by Abbott? How is it possible he could have done so without having information from some one? If he did not receive it from Ball, who did he receive it from? It stands admitted that he did not receive it from McNeill and Hodder. His stenographer would have known

no more of it than he did. Abbott says that he instructed Ball what to put into the instrument of writing, and Ball says he gave the terms to Brizzolara. The only person who could explain it, so far as the proof shows, is Brizzolara or his stenographer. Nor could this transaction have escaped the attention of either Brizzolara or his stenographer, because at the very time that Ball was instructing Brizzolara as to what to put in the instrument, McNeill and Hodder were in a heated wrangle in the office about this very matter. The heated wrangle itself would have called attention to what was going on in the office. Such attention as would not have been readily forgotten by any of the parties present. Ball did not forget it. He refers to it. But there is another feature of this matter which cannot escape attention. Primarily this instrument of writing was prepared to secure Abbott and the American National Bank. Abbott was primarily a trustee for the bank, and secondarily a trustee for John Hodder and his sister. The stock transferred to Abbott, in other words, was to be held first to secure the bank, and after the bank was paid then to secure John Hodder and Jane Hodder. There is no denial of the fact by anybody that the whole of this instrument, as it relates to the security of the American National Bank, was correctly prepared. There is no denial of the fact by anybody that this instrument of writing grew out of the differences between Hodder and McNeill as to this $25,000 debt, and that this instrument of writing is the result of that controversy and the arbitration made by Mr. Abbott. Now, if you eliminate the latter part of paragraph 6, relating to Abbott's trusteeship for John Hodder and Miss Jane Hodder, then there is not a line, nor a word, nor a sentence, or even a suggestion in the instrument that there had ever been any controversy at all between Hodder and McNeill of any kind. In the absence of that controversy, this instrument of writing would never have had an existence, although, as stated, it is drawn primarily so as to protect Abbott and the bank. Why should the instrument of writing have been prepared at all, if to be totally eliminated from it is the very matter which brought it into existence? The very reason of the existence of this instrument was the adjustment and settlement of the difference between McNeill and Hodder; but yet, it is now contended that the only paragraph in the instrument of writing which settled that difference was put there without authority of anybody. It cannot be true. It is said that this instrument of writing was never executed, and that Abbott knew nothing of this provision. It will be remembered that this instrument of writing, as stated, was primarily intended to secure the very debt now in controversy; that is to say, the $17,549.79 then due the bank, and subsequent advances made or to be made. This instrument, therefore, came into existence, and was brought to the attention of Abbott, Ball, and Brizzolara. At the time it was drawn it is shown that John Hodder and Jane Hodder had an indebtedness of $25,000 against the Virginia Company. On the 11th of August—some 20 days after this instrument of writing was drawn—Hodder took to the bank and delivered to Ball the stock provided for in the sixth paragraph of the instrument of writ-

ing referred to, and the receipt he took is absolutely identical in its provisions with the sixth paragraph. That provision describes that Hodder and McNeill obligated themselves to deliver to Abbott all the stock belonging to the Virginia Hardwood Manufacturing Company, and the receipt reads:

Fort Smith, Aug. 11th, 1904.

Received for W. R. Abbott the following certificates of stock of the Virginia Hardwood Manufacturing Company

| # 1 John Hodder | 8 shares |
| # 2 Angus McNeill | 1 share. |
| # 8 John Hodder | 46 shares. |
| # 5 John Hodder | 43 shares |

as per agreement signed by John Hodder and A. McNeill.

P. A. Ball.   Cashr.

What is meant by the words "as per agreement signed by John Hodder and A. McNeill"? They cannot mean anything except "as provided for in a certain agreement signed by Hodder and McNeill." That stock was received by Ball, the cashier, and preserved among the files of the bank, and remained there until the controversy between these parties began in the spring of 1905. Abbott and Ball say that the words "as per agreement signed by John Hodder and A. McNeill" referred to the instrument of writing which is in evidence of August 10th; but that instrument of writing was simply a personal guaranty of McNeill and John Hodder for the payment of the indebtedness of the Virginia Hardwood Manufacturing Company, and is a guaranty, not to Abbott, but to the bank, and makes no reference whatever to any stock of any character. The contention fails, because the guaranty of August 10th has no relevancy whatever to the delivery of the stock described in the receipt. It follows, therefore, as the result, that as far back as July 23, 1904, Abbott himself and Ball, the president and cashier of the American National Bank, had notice of the fact that Hodder and his sister had a claim of $25,000 against the Virginia Company. It is said that this instrument of writing, unless it was read by Abbott, was no notice to the bank; but the position is not tenable. As stated, the instrument itself shows on its face that primarily it was intended to secure Abbott and the bank. It was drawn by Brizzolara under the directions of Ball, who had received his directions from Abbott. When executed by Hodder and McNeill, it was returned by Brizzolara to the bank, and in pursuance of it the stock was subsequently delivered to the bank, and both retained by them until this controversy began. Brizzolara must be held to have been Abbott's attorney. As stated, the very debt to be secured by this paper was a part of the debt now in controversy, as well as any other indebtedness which might subsequently accrue. The very fact, therefore, that John Hodder and his sister claimed this indebtedness was brought to the attention of the bank's attorney, the bank's president, and the bank's cashier while engaged in securing this very debt, for which Abbott was the security by indorsement, and therefore was clearly within the scope of their agency. The knowledge of Brizzolara was the knowledge of the bank, the knowledge of Ball was the knowl-

edge of the bank, and the knowledge of Abbott was the knowledge of himself and of the bank; and it makes no difference in law really as to whether Ball or Abbott ever saw the paper at all. It was delivered to the bank to protect the bank in its loan to the Virginia Company, for which Abbott was the indorser, and they cannot be heard to say now that they did not read it, and did not know its contents. Babbitt v. Kelley, 9 Am. Bankr. Rep. 335, 70 S. W. 384; Curtice v. Crawford County Bank, 118 Fed. 390, 56 C. C. A. 174. This paper therefore discloses the two facts that as early as July 23, 1904, the bank was demanding security other than the indorsement of Abbott, and with the knowledge of Abbott; and, secondly, that the bank, Abbott, Ball, and Abbott's attorney all knew that at that time Hodder and his sister had a claim against the Virginia Company of $25,000. Knowing this, they were bound to know that when this mortgage was taken the Virginia Company was insolvent when it brought its secondhand machinery (estimated by its officers to be worth $21,000) to Ft. Smith, for it then owed the Hodder debt of $25,000. The testimony conclusively shows that the indebtedness of the company steadily increased from the time the plant was landed here until the mortgage was given, and Mr. Abbott (of all persons except its officers) was more familiar and conversant with that fact than any other person, so far as the proof shows.

It must be held, therefore, that when Abbott called upon Brizzolara, his attorney, to draw the mortgage of January 26, 1905, Abbott knew this mortgage was covering nearly all of the assets of the Virginia Company, and that that company at that time was indebted to other creditors in the sum of about $25,000 due the Hodders, plus the aggregate of the other creditors shown by the statement of January 1, 1905, to wit, $13,518.78, making in the aggregate over $38,000, for the payment of which only nominal assets of the Virginia Company remained. Knowing the Virginia Company was insolvent at the time he took the mortgage, and knowing that the mortgage covered substantially all the Virginia Company's assets, and knowing that the company owed other creditors over $38,000, the conclusion is irresistible that he must have known that the mortgage, if enforced, must necessarily operate to give him a preference over other creditors; and therefore, since one must be held to have intended that which was the natural and logical result of his acts, he must have known that the mortgage was intended to give him a preference over other creditors.

The decision of the referee in this case is affirmed, and the claim of Abbott is allowed as an unsecured claim. It is so ordered.