## CURTICE v. CRAWFORD COUNTY BANK et al.

(Circuit Court of Appeals, Eighth Circuit. October 27, 1902.)

No. 1,698.

1. BANKS—LIEN ON STOCK—RIGHTS OF PLEDGEE.

The lien of a bank upon its stock, given by statute, for any indebtedness to it from the stockholder, is subject to the lien of a pledgee of such stock, where the indebtedness to the bank was contracted subsequent to the pledge and after the bank had notice of it.

2. SAME—NOTICE TO PRESIDENT.

The president of a bank, to whom a pledgee of stock exhibited the certificate held by him to ascertain with certainty that it had been regularly issued, stating the fact of the pledge, received such information while acting in his official capacity, and the bank was thereby charged with notice of the pledge, so as to render its statutory lien on the stock for a loan subsequently made to the pledgor, although some two or three years afterwards, subject to the rights of the pledgee, whose debt had not been paid.

Appeal from the Circuit Court of the United States for the Western District of Arkansas.

This action was brought by James M. Curtice, the appellant, against the Crawford County Bank and E. B. Pierce, administrator of Robert S. Hynes, deceased, the appellees, to foreclose a lien on two certificates of stock, being certificate No. 133, dated March 15, 1894, and certificate No. 108, dated July 16, 1891, representing together 240 shares of stock, both of which had been issued by the Crawford County Bank, on the dates aforesaid, in favor of R. S. Hynes. It will suffice to say, concerning the bill of complaint, that it alleged the following facts, in substance: That in 1888 Curtice had loaned to the Crawford County Bank, hereafter referred to as the bank, and to Robert S. Hynes, its then cashier, the sum of $5,000, taking as collateral security for the loan certain certificates of stock in the bank to the amount of $7,500; that in 1889 the note of the bank for $3,000 was retired, and that, in place of the two notes originally executed, Hynes gave his individual note to Curtice in the sum of $5,000, which was secured by the stock originally pledged; that on March 15, 1894, the amount due on said note, with accumulated interest, was $8,400, for which sum a new note was executed by Hynes, which latter note was secured by a pledge of three certificates of stock, being certificates Nos. 106, 108, and 133, representing stock to the amount of 340 shares in the defendant bank, standing in the name of Hynes; that on July 17, 1895, a portion of the latter note having been paid, Curtice surrendered to Hynes certificate No. 106, representing 100 shares of stock, but retained certificate No. 133, for 40 shares, and certificate No. 108, for 200 shares, as collateral security for the balance of the indebtedness then due; that on the filing of the bill there was due to Curtice, on the aforesaid note, the sum of $7,000, which was secured by the shares of stock last aforesaid; and that, notwithstanding the fact that the bank had knowledge of all the transactions aforesaid, whereby the stock was pledged by Hynes to Curtice, it was asserting a superior statutory lien on the stock for a sum largely in excess of its value, for loans which it had made to Hynes after it had knowledge that he had pledged the stock. In its answer to the bill the defendant bank averred that, at the time the complainant loaned money to Hynes and received the aforesaid certificates in pledge, Hynes was indebted to the bank in the sum of $16,845.92, and that at the time it made such advances to Hynes it had no knowledge whatever that Hynes was indebted to Curtice, or that he had pledged his bank stock to secure

¶ 1. Rights and liabilities of pledgees of corporate stock, see note to Frater v. Bank, 42 C. C. A. 135.

the payment of such indebtedness, as was alleged in the bill. The bank accordingly prayed that its lien might be declared superior and paramount to the lien asserted by the complainant, if he had any. The case was tried on the aforesaid issues, and upon a cross-bill which was interposed by the bank, wherein it prayed for a foreclosure of its lien, not only upon certificates of stock Nos. 108 and 133, but upon three other certificates, Nos. 106, 107, and 134, which had also been issued in the name of Hynes. The lower court decreed that the lien of the defendant bank on certificates Nos. 108 and 133 was superior and paramount to the lien or claim which was asserted by the complainant. To reverse such decree the complainant prosecuted an appeal to this court.

W. C. Scarritt and O. L. Miles, for appellant.

James F. Read (James B. McDonough, on the brief), for appellees.

Before SANBORN and THAYER, Circuit Judges, and LOCH-REN, District Judge.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

On the trial in the circuit court there was no substantial controversy over the fact that Curtice, the complainant, loaned a considerable sum of money to Robert S. Hynes, he being at that time the cashier of the defendant bank, as far back as the year 1888, 1889, or 1890, and that this indebtedness had never been fully discharged. For the purposes of the trial it was admitted that, when Hynes died (an event which seems to have occurred during the summer of 1896), he owed the complainant, Curtice, and the defendant bank, the sums which they respectively claimed; and by its decree the lower court found that the amount due to Curtice, when the decree was entered, was $5,791.26, and that the amount due to the bank was the sum of $17,608.92, most of which latter sum consisted of advances made by the bank to a firm of which Hynes was a member, subsequent to September 23, 1893. Nor was there any controversy over the fact that Curtice had in his possession two certificates of stock, namely, certificate No. 108, for 200 shares, issued by the defendant bank on July 16, 1891, and certificate No. 133, for 40 shares, issued by it on March 15, 1894, and that these certificates had been pledged by Hynes, at least as early as March 15, 1894, to secure his indebtedness to Curtice, which at that date amounted to $8,400. The note for $8,400 executed on March 15, 1894, was produced, and it contained a pledge of the two certificates in question, as well as a pledge of certificate No. 106, which was surrendered to Hynes on July 17, 1895; a part of the indebtedness having at that time been paid. The real controversy in the case arose over certain issues of fact, namely, whether either of the aforesaid certificates, Nos. 108 and 133, was given in pledge to Curtice prior to September 23, 1893, and whether the bank had notice of the pledge when it began to make large advances to the firm of which Hynes was a member, subsequent to the last-mentioned date.

Before considering these issues of fact it should be stated that the laws of the state of Arkansas, under which the defendant bank was organized (Sand. & H. Dig. Ark. § 1342), gave the bank a lien upon the stock in controversy for all of Hynes' indebtedness to it; but

the lower court held, and we think correctly, that, notwithstanding this statute, the lien of a pledgee of its stock would prevail over the lien of the bank, so far as those debts of the shareholder to the bank were concerned that were contracted by the stockholder subsequent to the pledge and after the bank had notice thereof. It followed from this ruling, which is not seriously challenged, that if Curtice acquired either of the certificates aforesaid from Hynes as security for his claim prior to September 23, 1893, and the bank had knowledge of the fact, its lien for such advances would have to be postponed in favor of the superior lien of the pledgee. It is proper to observe, further, in this connection, that Curtice admitted that he did not acquire certificate No. 133 until March 15, 1894; and as Hynes was at that time indebted to the bank for an overdraft to the amount of $28,213, of which amount something over $17,000 is still unpaid, the complainant cannot, as a matter of course, assert a superior lien as respects that certificate. The controversy, therefore, is confined substantially to the questions of fact above mentioned, namely: Did Curtice hold certificate No. 108 in pledge prior to September 23, 1893, after which date the bulk of the advances to Hynes were made? And, secondly, had the bank been notified, prior to that time, that Curtice held the stock represented by that certificate in pledge?

The plaintiff testified, in substance, that stock certificate No. 108 was in his possession as pledgee prior to March 15, 1894, when the note of that date was executed by Hynes. He claimed that he had always held certificates of stock in the defendant bank, in pledge, since Hynes first became indebted to him in the year 1888 or 1889. He admitted that there had been some changes in the certificates thus pledged to him, owing to the fact that the bank had, on one or two occasions, increased its stock, and on that account had called in its old certificates, and issued others in lieu thereof; but he insisted that, notwithstanding such exchange of certificates, he had always held stock of the bank in pledge to secure his loan to Hynes, since the latter became his debtor, and had never been without such security. And, as respects the particular certificate now in controversy (No. 108), he stated that his impression was that this particular certificate was delivered to him in the year 1891, when he took a renewal note for the loan, and that it had been in his possession continuously since that date. Curtice further testified that on one occasion he advised Jesse Turner, Sr., who was the president of the defendant bank, that he held certain of the bank's stock in pledge to secure an indebtedness of Hynes, and at the same time exhibited to Turner the certificates which he so held. His statement was, in substance, that having been requested by Hynes, on one occasion, to send in the certificate or certificates which he held in pledge, and to take new ones in their place, owing to an increase of the bank's capital, he called at the bank to make such exchange, Hynes being at the time cashier of the bank; that when he called at the bank the stock book was opened in his presence, and that he discovered that Turner, as president, had signed certain stock certificates in blank; that, as this seemed an unusual proceeding, he took the new certificate or certificates, which Hynes attested and delivered to him,

to the president, to be sure that the stock was issued under proper authority; and that on this occasion he exhibited the certificates to Turner, told him that they had been issued by Hynes as collateral security for a debt which he owed Curtice, and that he also inquired concerning the value of the stock at that time. The complainant was unable to state definitely when this latter incident occurred; but he located it, as nearly as he was able to do, in the year 1890 or 1891,—the latter year being the one in which certificate No. 108 was issued.

The learned trial judge seems to have disregarded all of the aforesaid testimony as being unworthy of belief, holding, apparently, that there was no evidence worthy of credence showing that Curtice held any stock of the bank in pledge until March 15, 1894, after Hynes had become heavily indebted to the bank. As the issue to be determined is purely one of fact, it would subserve no useful purpose to go over the testimony in detail, and we shall not undertake to do so. Curtice undoubtedly made some mistakes in stating the details of some of his transactions with Hynes, which had been quite numerous, and the dates when particular interviews occurred and when certain certificates of stock were pledged to him; but such mistakes as he made in these respects are no greater than might have been expected of a witness who was testifying wholly from his recollection of transactions which had occurred seven or eight years previously. Considering his testimony as a whole, he appears to have testified fairly and with an evident intent to state the facts as they were. We have read his testimony carefully, and are unable to discover therein any instances of intentional prevarication which would authorize us to reject all of his evidence as being entirely untrustworthy, as the lower court appears to have done. The circumstance of his interview with Turner, in which he exhibited his certificates to ascertain if they were lawfully issued, was one of those incidents that would naturally remain fixed in the memory, although the precise date of the occurrence could not be remembered. After reading all of the evidence, which is preserved in the record, attentively, in the light of admitted facts and in the light of surrounding circumstances concerning which there is no dispute, we have reached the conclusion that Curtice continuously held stock of the defendant bank in pledge in greater or less amounts, as collateral security for the loan which he made to Hynes, from and after the year 1889 until the commencement of this action; that certificate No. 108, being the one now particularly in controversy, was turned over to Curtice as soon as it was issued,—that is to say, on July 16, 1891, or shortly thereafter; that this certificate, or possibly an earlier one, in lieu of which it was issued, was in fact exhibited to Jesse Turner, Sr., the president of the bank, in the year 1890 or 1891, most likely in the latter year, immediately after it was issued; and that he was notified at the time that the stock had been assigned to him by Hynes as collateral security for an indebtedness and was then held by him as such security. We are of opinion that the evidence is ample to sustain these conclusions of fact, and that the case should be decided accordingly.

It is strenuously urged, however, that even if it be true that Turner, the president of the defendant bank, was notified, in the year 1891, that Curtice was holding a part of Hynes' stock in the bank as security for a debt, yet that such notice did not affect the bank with knowledge of the fact communicated, because such knowledge was not acquired by Turner while he was acting for the bank and in the discharge of his duties as president. It is further said that because Turner did not take part in making the loans to Hynes subsequent to September 23, 1893, and as it was not shown that he ever communicated the knowledge which he possessed to the other officers of the bank, who did make such loans, the bank's lien, therefore, is not impaired by his knowledge acquired in the manner aforesaid. It is no doubt true that a corporation is not affected generally by knowledge which is obtained by one of its executive officers or agents when he is not engaged in the transaction of its business, although it is held that if such officer subsequently engages in a transaction for and in behalf of his company, in which the knowledge so acquired outside of the line of his duties becomes material and important, the corporation may be affected therein by the knowledge of its agent. Bank v. Cushman, 121 Mass. 490; Innerarity v. Bank, 139 Mass. 332, 334, 1 N. E. 282, 52 Am. Rep. 710. The converse of the first branch of the foregoing proposition is equally true,—that a corporation is bound, generally, by knowledge which is acquired by one of its executive officers when that officer is engaged in the legitimate transaction of the company's business. Holden v. Bank, 72 N. Y. 286, 292; Bank v. Campbell, 4 Humph. 394; Bank v. Irons (C. C.) 8 Fed. 1; Birmingham Trust & Savings Co. v. Louisiana Nat. Bank, 99 Ala. 379, 13 South. 112, 20 L. R. A. 600. In the present case it appeared that Curtice's sole object in exhibiting his certificates of stock to Turner, they having been signed by the latter in blank, was to ascertain if Hynes, the cashier, had authority to issue them to himself as he had done. This information he sought from the proper officer, by exhibiting the certificates, without making any direct inquiry; and in explanation of his action he informed him that the certificates had been assigned to himself as collateral security for a loan. Under these circumstances we are of opinion that Turner must be regarded as having been acting for the bank when he received notice that the stock was held in pledge by Curtice, and that the knowledge which was acquired in the course of that interview affected the bank generally, even if it was not communicated to the other executive officers. It was at least knowledge of a fact which ought to have been communicated to the other officers of the corporation to govern their future action. When one acquires or is about to acquire a certificate of stock in a corporation, he is clearly entitled to seek information from the president, who has signed the certificate, if he entertains any doubt of its regularity or whether it was lawfully issued, and information which is given in response to such an inquiry is communicated by the officer in an official capacity while acting within the scope of his duty.

We conclude, therefore, that the advances which were made to Hynes by the defendant bank, subsequent to September 23, 1893;

must be regarded as having been made with knowledge that the shares of stock represented by certificate No. 108, dated July 16, 1891, were pledged to Curtice as security for a debt. It is true that these advances were not made until some time after the knowledge in question had been acquired; but it cannot be said to have been the duty of the pledgee of the stock to have given other notices from time to time that it had not been redeemed and that he still held it. It was rather the duty of the bank, before it made advances to Hynes (if the loans were made in reliance on its statutory lien), to have ascertained if Curtice still held the stock in pledge, inasmuch as it had once been advised that such was the fact, and it had received no notice that a different state of affairs existed or that the stock had been redeemed.

The result is that the decree of the circuit court was erroneous in the respect heretofore indicated, and the same should be modified to the extent of ordering that the proceeds of the sale of stock certificate No. 108, after deducting its pro rata of the costs of the action in the circuit court, be applied first to the payment of the indebtedness due from the estate of Robert S. Hynes, deceased, to the appellant, and that any sum which may remain after such indebtedness and accrued interest is discharged be applied on the claim of the Crawford County Bank. It is so ordered, and that the costs in this court be taxed against the appellees.