The judgment of the district court will be affirmed.

Judge STAHL participated in the hearing and decision of this case but died before the opinion of the court was filed.

**ACME PRECISION PRODUCTS, INC., and William F. Jobbins, Inc., Appellees,**

v.

**AMERICAN ALLOYS CORPORATION, Appellant.**

**No. 19688.**

United States Court of Appeals, Eighth Circuit.

March 18, 1970.

George N. Hibben, of Hibben, Noyes & Bicknell, Chicago, Ill., for appellant; Thomas M. Scofield, of Scofield, Kokjer, Scofield & Lowe, Kansas City, Mo., with him on the brief.

Theodore R. Scott of McDougall, Hersh, Scott & Ladd, Chicago, Ill., for appellees; R. T. Brewster, of Slaughter & Brewster, Kansas City, Mo., with him on the brief.

Before MATTHES, GIBSON and LAY, Circuit Judges.

LAY, Circuit Judge.

On December 22, 1962, a patent infringement suit was brought by plaintiffs, Acme Precision Products, Inc. (hereinafter Acme) and William F. Jobbins, Inc. (hereinafter Jobbins II), against defendant American Alloys Corporation (hereinafter American). The patent was issued on August 14, 1951, to the predecessor of Jobbins II, also known as William F. Jobbins, Inc. (hereinafter Jobbins I). It pertained to an aluminum-magnesium casting alloy, a high strength alloy with physical properties in an *"as cast"* condition allegedly superior to most heat treated aluminum alloys. At the time the patent was issued, Jobbins I was a wholly owned subsidiary of Acme. On October 3, 1951, the letters of patent No. 2,564,044 were assigned to Acme. In 1956, Jobbins I was dissolved; Jobbins II was formed independent of Acme and at first given a nonexclusive license under the patent in question. In 1958 Acme gave Jobbins II an exclusive license to sell and distribute the patented alloy. In 1967, defendant American was granted leave to file a counterclaim. It therein asserted that plaintiffs had continually sold the '044 patented alloy with knowledge that the patent had been procured by a fraud upon the patent office. Relying upon the *Walker* case,[1] the defendant prayed for treble damages based upon a monopoly in violation of Section 2 of the Sherman Anti-Trust Act, 15 U.S.C. § 2.

The district court found that the patent was invalid since it failed to meet the tests of nonobviousness, and therefore dismissed plaintiffs' claim for infringement. Cf. University of Ill. Foundation v. Winegard Co., 402 F.2d 125 (8 Cir. 1968). Defendant's counterclaim was likewise dismissed. This appeal is brought by the defendant and relates solely to the dismissal of its counterclaim alleging Section 2 violations of the Sherman Act and the denial of attorney fees under 35 U.S.C. § 285.

Under the *Walker* case a party to sustain recovery must either show that the patent was procured by fraud or, if the original applicant is not the party enforcing the patent, that the acquiring party had knowledge of the fraudulent manner in which the patent was procured. Once fraud is proven, the other elements of a charged Section 2 Sherman Act violation, relating to the relevant market for the product involved, the dominant position of the party charged in the market, and damages, if any, must also be proven. 382 U.S. 172, 178, 86 S.Ct. 347, 15 L.Ed.2d 247.

The district court found that neither of the plaintiffs nor their officers or directors had knowledge of any fraud in the procurement of the patent. The district court held under these circumstances that it was not necessary to pass on the question of the alleged fraud in the procurement of the patent and made no finding of fact as to the issue of fraud. Therefore, the only issue on appeal is whether the district court's

---

1. Walker Process Equip., Inc. v. Food Machinery & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

finding as to the lack of knowledge on the part of the plaintiffs was clearly erroneous. We hold that it was and remand for further finding of fact by the district court as to the remaining issues.

The corporate history and relationship of the parties is significant to our conclusion. In 1946 Jobbins I became a wholly owned subsidiary of Acme. William A. McKnight, who had been in charge of Jobbins I for twenty years, then became a Director of Acme and continued as general manager and secretary-treasurer of Jobbins I. He died in 1951. Previously, in 1945, Acme had also acquired all the assets of Cooper Metallurgical Laboratory of Cleveland, Ohio, and operated the same as a research division of Acme until 1948. This research division was under the direction of Hugh S. Cooper, a renowned research chemist and metallurgist. Charles V. Cooper, Hugh S. Cooper's son, served as chief metallurgist of the division from 1945 to 1947. In 1947 he transferred to Jobbins I as plant metallurgist and became its chief executive in 1951. C. V. Cooper died in 1960. Charles B. Willmore was employed by Jobbins I from 1945 to 1949 as a research metalurgist and was in charge of research for Jobbins I. He died prior to the trial. In 1956 Jobbins I was dissolved. C. V. Cooper, as the head of a group of former officers of Jobbins I, purchased all Jobbins I assets. A new corporation called William F. Jobbins, Inc. (Jobbins II), was formed. C. V. Cooper became its new president.

The evidence showed that as early as 1946 Hugh S. Cooper and his Russian assistant, Vladimir Tzvetcoff, developed an aluminum-magnesium alloy which Acme sold under the trade name of Almag 35, the number referring to its tensile strength of 35,000 pounds per square inch. On July 30, 1946, Hugh Cooper, while employed by Acme, filed a patent application for this alloy. It is undisputed that Acme was to own all patent rights resulting from Cooper's research. The alloy used various percentages of components and limited the percentage of impurities, in order to obtain the tensile strength desired. In 1947 or the early part of 1948, Acme transferred the production and sale of Almag 35 to its wholly owned subsidiary Jobbins I. Willmore, then head of Metallurgy for Jobbins I began working with Almag 35. On January 14, 1949, fully aware of the Cooper application and claims, Willmore also filed an application for an aluminum-magnesium alloy with the patent office. As was later admitted, many of these claims duplicated and overlapped the Cooper application. McKnight of Jobbins I supervised the handling of both applications. On July 26, 1949, the Cooper application was rejected by the patent office on the ground of prior art. This ruling was sustained on appeal by the Patent Office Board of Appeals on December 11, 1950. The Willmore application was rejected by the examiner on May 2, 1951. However, the examiner did find that "the restriction of impurities to certain amounts is the critical distinction of the present alloys over the alloys of the prior art." He therefore observed that if comparative tests would show Almag 35 superior to aluminum-magnesium alloys containing a higher percentage of impurities but otherwise having similar composition the examiner would be favorably inclined toward the application. This was done and the patent was granted on August 14, 1951.[2]

Our review of the evidence demonstrates that there exists overwhelming proof of the joint activity [2A] of Acme's

2. In denying plaintiffs' suit for infringement the trial court found that the limitation of impurities to 0.45% had been fully anticipated by Cooper as far back as 1946.

2A. We do not intend to imply that the dual applications or the overlapping claims demonstrate fraud. We are concerned here only with the question of knowledge of the prior art and what that would entail in representations made to

officers (McKnight) and its research chief (Hugh Cooper) along with Jobbins I's research personnel (C. V. Cooper and Willmore), in the prosecution of the Willmore-Jobbins I patent. Willmore's progress report of January 17, 1949, sent to McKnight, demonstrates that he considered Hugh Cooper's application as well as his own application to be a joint effort to secure a patent for Acme. This report reads:

> "In drawing the claims in the new application, the Attorney has taken full account of the claims in the previous Cooper Applications. Thus in a few cases, where there is a possibility that the claims may overlap, the overlapping ranges have been covered in separate claims in the new application. *This allows two alternative methods of procedure.* If claims on these ranges are allowed in the Cooper applications then they will be withdrawn from the new application. On the other hand, if the claims in the Cooper applications meet with final failure of approval, they will be allowed to ride in the new application. *It will be noted that this procedure gives us two opportunities of obtaining rather broad coverage.*" (Emphasis ours.)

■■ It is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself. United States v. United States Cartridge Co., 198 F.2d 456 (8 Cir. 1952); New York Life Ins. Co. v. Chapman, 132 F.2d 688 (8 Cir. 1943); England v. American Southern Ins. Co., 380 F.2d 137 (4 Cir. 1967); Bergeson v. Life Ins. Co. of America, 265 F.2d 227 (10 Cir. 1959); Sawyer v. Mid-Continent Petroleum Corp., 236 F.2d 518 (10 Cir. 1956); cf. Kenneally v. First National Bank, 400 F.2d 838 (8 Cir. 1968). Furthermore, knowledge by a corporation, obtained by and through its officers and key employees, of facts of continuing importance to the business of the corporation, even after the termination of services of that officer or employee, is conclusive upon the corporation. Mechanics' Bank v. Seton, 26 U.S. 299, 7 L.Ed. 152 (1828); United States v. Ridglea State Bank, 357 F.2d 495 (5 Cir. 1966); Constam v. Haley, 206 F. 260 (6 Cir. 1913); Curtice v. Crawford County Bank, 118 F. 390 (8 Cir. 1902); Annot., 73 A.L.R. 420, 421 (1931); Restatement (Second) of Agency § 275, comment e (1957); Fletcher, Cycl. Corporations § 801 (rev. ed. 1965).

■ The undisputed evidence caused the district court to find that "the patent rights to any invention by '[Hugh Cooper or Willmore]' were owned either directly or indirectly by Acme." Under these circumstances the law is clear that where a subsidiary corporation acts as a direct instrumentality of and in direct cooperation with its parent corporation, and where the properties and affairs of the two are so inextricably confused as to a particular transaction, the corporate structures cannot exist separate one from the other. NLRB v. Deena Artware, Inc., 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157 (7 Cir. 1963); Fisser v. International Bank, 282 F.2d 231 (2 Cir. 1960). We hold Acme, at least, must be conclusively presumed to have knowledge of its own conduct.

■ There remains the issue as to the knowledge of Jobbins II, the exclusive licensee of the '044 patent. The trial court's finding that Stumm and Arundale, former officers of Jobbins I and present officers of Jobbins II, did not have actual knowledge of the prior charged complicity between Acme and Jobbins I, cannot be said upon the whole record to be clearly erroneous. Defend-

---

the patent office with particular emphasis on the varying percentages of impurities and the significance thereof and the percentage of beryllium in the two patent formulas under discussion.

ant's reference to alleged reckless conduct by these officers is not enough to prove knowledge of fraud. Nevertheless, in view of the clear weight of the evidence demonstrating C. V. Cooper's (Jobbins II's president) knowledge as to the procurement of the patent, the district court's finding as to the absence of knowledge by Jobbins II must be set aside.[3]

The evidence is undisputed (1) that C. V. Cooper was familiar with the prior production and formulas while working with his father on Almag 35, when both were employed by Acme from 1945 to 1947; (2) that C. V. Cooper was employed as plant metallurgist by Jobbins I at the time of the joint prosecution of the Jobbins I-Willmore and Acme-Cooper applications for patent letters; (3) that C. V. Cooper was the recipient of copies of correspondence between his father and McKnight as to the details of Almag 35 and the low impurity content; (4) that C. V. Cooper was present at the August 16, 1948, meeting where the Acme-Cooper formula was discussed with McKnight, Hugh Cooper and Willmore; it was the same meeting at which Willmore discussed his proposal to also file an application; and (5) that C. V. Cooper was the addressee of the March 13, 1951, letter from Jobbins I's attorney Hersh, defendant's Exhibit 66-FF, which discussed the Jobbins I application and the patent office rejection of Hugh Cooper's application. This letter disclosed in part:

"This accented the importance of impurity and Mr. Marmelstein [patent office examiner] suggested that if we set forth the limitation of .45 per cent impurity in the final product that we might be able to distinguish over the references and secure allowances although he would like to compare these claims with the Cooper applications to determine why they were

not allowed and whether allowance of these claims will be inconsistent therewith."

Other additional facts exist as to Cooper's knowledge concerning the procurement of the '044 patent letters. On March 29, 1951, C. V. Cooper received a letter from Hersh with a copy of an amendment of the patent application, defendant's Exhibit 66-II; on May 7, he received a letter from Hersh asking that special samples be prepared with greater than .45 percent impurities to show the critical nature of limiting the amount of impurities, defendant's Exhibit 66-JJ; and on July 9, C. V. Cooper was finally informed that the patent had been obtained, defendant's Exhibit 66-MM. This evidence, and there is much more in a similar vein within the record, is not contradicted in any way. Under these circumstances, we find corporate knowledge of Jobbins II through its president, C. V. Cooper, as to the facts surrounding the procurement of the Jobbins I-Willmore patent. In view of our finding we need not discuss the evidential detail of the dual knowledge of the company's attorneys.

The other issues within defendant's counterclaim have not yet been decided. Although the record is completed, this court should not pass on the issue of fraud, or any other remaining issues necessary to prove a Section 2 violation, without findings being made first by the district court.

Since the suit on the counterclaim is remanded for further findings, we do feel compelled to make certain observations governing the alleged charge of fraud. The issue of fraud relates primarily, although not necessarily exclusively, to the alleged concealment from the patent office of (1) the percent of impurity of content of the Hugh Cooper alloy and (2) the public uses of the Acme alloy prior to the Willmore ap-

3. C. V. Cooper's knowledge was acquired at a time when he was an official with Jobbins I, and prior to his becoming president of Jobbins II. Nevertheless, the law recognizes that C. V. Cooper's previously acquired knowledge is imputed to Jobbins II, the corporate successor of Jobbins I. Restatement (Second) of Agency § 276 (1957); Fletcher, Cycl. Corporations §§ 790, 799 (rev. ed. 1965).

plication. Although the district court did not pass upon this issue in its memorandum,[4] in discussing the knowledge of McKnight and Cooper as to the alleged fraud, it did reason that any element of motive to commit fraud by either individual was nonexistent. The district court found that McKnight was working for both Acme and Jobbins I and was, therefore, indifferent as to which of the two patent applications would be approved. On similar reasoning the district court found that C. V. Cooper of Jobbins I would have no interest or motive in supporting "the Willmore application over that of his own father." The difficulty with these observations is that they misconstrue not only the defendant's theory as to fraud but the law as well. The issue is not whether plaintiffs were fraudulently supporting the Willmore claims over those of Hugh Cooper. The charge is that the Willmore patent was fraudulently procured in disregard of the *public interests as to restraint of trade*, by concealing the facts that Acme had publicly used the same alloy for at least one year prior to Willmore's application and that Hugh Cooper, rather than Willmore, was the original inventor of Almag 35.

Apropos is Mr. Justice Murphy's observation in Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945):

"Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies. Only in that way can the Patent Office and the public escape from being classed among the 'mute and helpless victims of deception and fraud.'"

The issue on fraud remaining is whether there was collusion in obtaining the '044 patent letters by concealing all relevant facts known by the applicants concerning prior art and usage from the patent office. The district court must make a determination of this matter. All other issues concerning the Section 2 violation of the Sherman Anti-Trust Act are likewise remanded.

The district court's dismissal as to defendant's counterclaim is vacated, including its denial of attorney fees, and the case is remanded for further proceedings in accord with this opinion.

---

4. In ruling upon the defendant's motion to amend the judgment under Fed.R.Civ.P. 59(e) for attorney fees, the district court in denying the motion did comment that defendant had failed to sustain its burden of proof as to fraud. In view of the district court's prior memorandum opinion and judgment, and its statement that the issue of fraud is not passed upon, we need not decide the effect of this later statement. The judgment was not amended. In addition, there was no finding of fact as required under Fed.R.Civ.P. 52(a) on this issue. In view of this court's holding as to the proven knowledge of Acme and Jobbins II, we feel all remaining issues should be fully briefed and reargued before the district court under the principles set forth herein.