**ACME PRECISION PRODUCTS, INC. and William F. Jobbins, Incorporated, Plaintiffs,**

v.

**AMERICAN ALLOYS CORPORATION, Defendant.**

**Civ. A. No. 14196–2.**

United States District Court, W. D. Missouri, W. D.

July 28, 1972.

As amended Aug. 10, 1972.

Richart T. Brewster, Slaughter &
Brewster, Kansas City, Mo., Theodore R.
Scott, McDougall, Hersh, Scott & Ladd,
Herman J. Gordon, Dressler, Goldsmith,
Clement & Gordon, Chicago, Ill., for
plaintiffs.

Thomas M. Scofield, Kansas City, Mo.,
George N. Hibben, Hibben, Noyes &
Bicknell, Chicago, Ill., for defendant.

## MEMORANDUM AND JUDGMENT

COLLINSON, District Judge.

Stated briefly, defendant filed an
anti-trust counterclaim in this patent in-
fringement suit. The counterclaim was
based on the teachings of Walker Proc-
ess Equip., Inc. v. Food Machinery &
Chem. Corp., 382 U.S. 172, 86 S.Ct. 347,
15 L.Ed.2d 247 (1965). That case held
that a Section 2 Sherman Act violation
could be maintained for monopolistic
practices based on a patent procured by
fraud. The case further laid down the
rule that if the party attempting to en-
force the patent had acquired the patent
from the original applicant, the anti-
trust claimant must prove that the ac-
quiring party had knowledge of the
fraudulent manner in which the patent
was obtained.

This Court found the patent invalid,
but dismissed the counterclaim on the
sole ground that the defendant had
failed to sustain the burden of proof
that these plaintiffs (who were not the
original applicant) had any knowledge

of fraud in the procurement of the patent.

The plaintiffs did not appeal from the judgment finding the patent invalid. The defendant appealed, first from the denial of allowance of attorneys' fees in the defense of the infringement suit (Section 285 of Title 35, United States Code), and also from the dismissal of the anti-trust counterclaim.

The Court of Appeals found that these plaintiffs did have full knowledge of all the circumstances surrounding the securing of the patent, and remanded the case with directions to this Court to determine (1) if there was fraud in the procurement of the patent, and, if so, (2) to determine if plaintiffs' actions in attempted enforcement of the patent constituted a Section 2 Sherman Act violation, and, if so, (3) to determine defendant's damages. The Court held that all these issues "should be fully briefed and reargued before the district court under the principles set forth herein." Acme Precision Products et al. v. American Alloys Corp., 422 F.2d 1395 (C.A.8, 1970).

These issues have been fully briefed and some facts (pertaining to attorneys' fees) have been stipulated by the parties.

■ This Court finds, from the overwhelming evidence in the case, that there was fraud in the procurement of the patent. The evidence disclosed that the applicant concealed material facts as to prior art and commercial use well known to the applicant; that deliberate misrepresentations were made as to new art in limiting impurities. It is clear that under all the cases deception or concealment of material facts from the Patent Office constitutes fraud in the procurement of the patent Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

The opinion of the Court of Appeals directed this Court, if it found fraud in the procurement of the patent, to determine if "the other elements of a charged Section 2 Sherman Act violation, relating to the relevant market for this product involved, the dominant position of the party charged in the market, and damages, if any," had been proved.

There can be no question about the relevant market and the dominant position of the plaintiffs. All of the primary producers of aluminum in the United States were forced by notices of infringement and threats of suit to take licenses under this patent and pay a royalty of Two Cents a pound on every pound produced under the patented formula. Plaintiffs advertised their patent widely in trade magazines and unquestionably made every effort to stifle all competition, which culminated in this infringement lawsuit against the defendant.

The relevant market was clearly shown. There was no substitute in existence for this high-strength aluminum alloy. Government specifications called for it. It seems obvious that the giant aluminum producers would not have paid the royalty if there were effective substitutes which did not infringe the patent. And it is further obvious that plaintiffs did dominate the market and take every conceivable means to eliminate competition.

■ The sole remaining factual question to be decided is whether or not defendant suffered damages by reason of these monopolistic practices. The simple answer to this is that the expenses, including attorneys' fees, of defending an infringement suit brought as part of an illegal attempt to monopolize and to restrain trade are properly assessable damages in an anti-trust action for such attempt to monopolize. American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977 (C.A.8, 1966). Most substantial attorneys' fees incurred and paid by defendant in defending the infringement suit have been proved.

■ But, in addition to the attorneys' fees, the defendant is claiming very substantial damages from loss of sales due to the plaintiffs' attempt to monopolize

the market. Defendant's evidence was basically that all the salesmen for the patented product, Almag 35 (salesmen of primary sources, of secondary sources, and of the plaintiff Jobbins), called on all the customers of the defendant. These customers were foundries. At the time this suit was instituted these salesmen told all of defendant's customers of the institution of the suit, and told them that when the suit was over they would no longer have a supply of defendant's product, Amalloy. The defendant introduced a series of exhibits, which showed a substantial decline in its Amalloy sales commencing about the time of the filing of this suit. If this substantial loss of sales was, in fact, attributable to the filing of the infringement suit, which obviously was an attempt to monopolize the market, the defendant would be entitled to very substantial damages on this ground. The difficulty with the defendant's position is, however, that there is no direct evidence of any kind to demonstrate that the loss in sales was due in any way to the filing of the infringement suit, or the representation of the salesmen about the suit. The defendant called the representatives of two of its foundry customers, who testified that salesmen for Almag had told them about the suit and urged them to buy Almag because it would soon be the only such product available. However, they both testified that they had not decreased their Amalloy orders in any way because of this information. The plaintiffs then called nine witnesses, representing eight of the foundry customers listed in plaintiffs' exhibits, all of whom testified that they had either not known about the suit or that they did know about it, but it did not affect their orders of Amalloy in any way. One, in fact, testified he had gone out of the foundry business, which was the reason he had not purchased any more Amalloy. The testimony of all of these witnesses was most convincing and credible.

This is not the type of a situation in which the courts have held that, if the victim of an anti-trust conspiracy has undoubtedly been damaged, he shall not be denied damages because they are incapable of strict and precise proof. In many of those cases the decisions have gone very far in allowing what has to be labeled "speculative damages".

But, in this case, this defendant had a list of every customer to which it had previously sold Amalloy, with a complete record of the sales. Undoubtedly, it had the names of all foundries its salesmen had called upon to attempt to sell Amalloy. Direct proof was easily obtainable from any of these customers or potential customers who had curtailed or ceased their purchases of Amalloy because of the infringement suit, or because of any threats or intimations of future trouble from the plaintiffs. The defendant produced no such direct evidence of any kind, nor did the defendant produce any explanation (such as fear of reprisal from plaintiffs) for the absence of such testimony. This Court holds that the defendant has wholly failed in proving damages from loss of sales.

■■ The evidence as to attorneys' fees is far different. Counsel for the defendant have produced clear evidence of all the attorneys' fees for which they billed defendant in this lawsuit and clear evidence that all of these bills have been paid in full by the defendant. In fact, the only issue for this Court to decide is the proper allocation of these attorneys' fees between the defense of the infringement suit and the advocacy of the anti-trust counterclaim. It is axiomatic that those fees which were incurred in defense of the infringement suit will be tripled as damages in the anti-trust action. The remaining fees paid by defendant will, of course, have great probative value in the Court's determination of the proper attorneys' fees to be allowed in the anti-trust action. In this connection, since the only appeal taken in this case was by the defendant from the trial court's dismissal of the anti-trust counterclaim and disallowance of attorneys' fees, this Court deems it obvious that all services of the defendant's attorneys after the appeal was taken

would not be properly attributable to the defense of the infringement suit.

The defendant contends otherwise. Its argument is based on the fact that the appeal was from the Court's denial of Section 285 fees to it as the prevailing party, as well as the dismissal of the anti-trust counterclaim. Defendant contends that the extensive briefing of the issue of fraud in the patent office was necessary to establish its right to a Section 285 allowance, and that this was a "patent case" issue. It has allotted almost three-fourths of its attorneys' fees on appeal, and almost one-third of its attorneys' fees *after remand* to the patent issue, and the remainder to the anti-trust issue. The total fees and expenses claimed by defendant after final judgment in the patent suit, and which defendant seeks to have included in its damages for defense of the patent suit (which will be trebled) is over $25,000.-00.

Of course, this same effort, on exactly the same issues, resulted in a decision which entitles the defendant to all its fees in defense of the patent case three times over, as well as a reasonable fee for prosecution of the anti-trust claim, without any reliance on Section 285.

■ Without any precedent, this Court believes that a "highest and best use" rule should be invoked. The legal services of defendant's counsel, after final judgment in the patent suit, resulted in a far more beneficial result to defendant than allowance of untrebled Section 285 fees, and should therefore be allocated to advocacy of the anti-trust claim.

■ ▪ This result also falls within the spirit and purpose of the law. Trebling of damages against a violator of the anti-trust laws is a punitive measure. When the plaintiffs did not appeal the judgment holding the patent invalid, all threats of monopoly and restraint of trade terminated. Legal services rendered the defendant thereafter could not have been to protect it from monopolistic practices of a wrongdoer, and the reason to allow these fees threefold does not exist.

The Court finds that the total attorneys' fees paid by defendant in defense of the patent infringement suit were $60,523.75. The stakes in the infringement case were high. From 1956 through 1967 the defendant sold from slightly over one million pounds to two and three-quarter million pounds of the alloy each year. The total national market varied from four and one-half million to almost eight million pounds per year. The plaintiffs were claiming a royalty of Two Cents a pound on these millions of pounds sold by defendant. The defenses of prior use and fraud on the patent office involved proof of facts which occurred many years in the past, and defense counsel demonstrated exceptional diligence and ingenuity in developing these defenses.

The defendant has allocated $14,736.76 of out-of-pocket expenses to the patent issues tried in circuit court. These are expenses which defendant has actually paid, and the allocation to defense of the patent issues is reasonable and logical. These will be allowed and added to the allowable attorneys' fees, which makes a total of $75,260.51 total cost to the defendant of defending the patent infringement suit. This sum trebled (dropping the odd cents) is $225,780.00, which this Court finds to be the proper amount for the trebled damages in the anti-trust counterclaim.

This leaves the question of the proper allowance of attorneys' fees for prosecution of the counterclaim. The defendant has documented the actual payment of attorneys' fees in this litigation in the total sum of $145,807.25. Deducting the fees the Court has allocated to defense of the patent suit, the defendant has paid an additional $85,283.50 to its counsel. The plaintiffs have disputed only two items (DXSS 78(a)(b) and DXSS 79(a)(b)(c) ) totaling $1,312.00. The Court believes these two fees were not properly chargeable to the litigation and will disallow this amount.

But plaintiffs do challenge the amount of fees billed after remand of the case by the Court of Appeals, which amount to $44,555.00 (after deducting the $1,312.00 mentioned above). They contend that these fees (almost entirely for briefing the issues as directed by order of remand) represent unnecessary work and time spent.

 Of course, the Court of Appeals of this Circuit has held in the past that the "reasonable attorney fee" allowed to the successful anti-trust claimant must bear a "reasonable relationship" to the amount of *untrebled* damages recovered. Twentieth Century Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (C.A. 8, 1952). This Court doubts if today the $150,000 fee awarded by Judge Duncan in that case would "shock the conscience" of any court.

The defendant in this case is seeking a total judgment of $1,092,939.92 trebled damages on its anti-trust counterclaim. Defendant's counsel have labored diligently and expertly to sustain this recovery. If this Court had granted a recovery in this amount, or if the Court of Appeals would do so upon appeal from this decision, the total fees of $83,971.50 paid by defendant for prosecution of the anti-trust claim would certainly be a reasonable allowance.

However, the untrebled damages awarded by this Court are approximately $75,000.00. In view of the admonition of the *Brookside* case that the attorneys' fee allowed must bear a reasonable relationship to the amount of recovery, untrebled, and taking into account the complexity of the issues, the difficulty of proof, and the untiring efforts of counsel, the Court will allow the defendant an attorneys' fee of $50,000.00 for prosecution of the anti-trust counterclaim.

It should be noted that defendant's counsel had no contingent fee contract of any nature with the defendant.

It is therefore

Ordered that the defendant is awarded a judgment on its counterclaim against the plaintiffs in the amount of $275,780.00 and costs.