ACME PRECISION PRODUCTS, INC.,
and William F. Jobbins, Inc.,
Appellees,

v.

AMERICAN ALLOYS CORPORA-
TION, Appellant.

Nos. 72–1560, 72–1585 and 72–1595.

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1973.

Decided Sept. 25, 1973.

Rehearings Denied Oct. 30, 1973.

6. Having granted the relief requested, there is no need to reach the other issues raised by appellant.

Thomas M. Scofield, Kansas City, Mo., for American Alloys.

Theodore R. Scott, Chicago, Ill., for Acme.

Veryl L. Riddle, St. Louis, Mo., for Jobbins.

Before MATTHES, Senior Circuit Judge, LAY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

We are presented with cross appeals arising from a judgment on a counterclaim in favor of American Alloys Corporation based on alleged violations of the antitrust laws in the fraudulent procurement and enforcement of a patent pertaining to an aluminum-magnesium casting alloy, known in the trade as Almag 35.

The original action was commenced on December 22, 1962, by the owner of the patent, Acme Precision Products, Inc. (hereinafter Acme) and William F. Jobbins, Inc. (hereinafter Jobbins II), Acme's exclusive licensee, against the defendant American Alloys Corporation (hereinafter American Alloys), for patent infringement. In 1967 American Alloys counterclaimed, asserting that the patent had been procured by fraud upon the patent office and that the plaintiffs had continually sold the patented alloy, Almag 35, with knowledge of the fraudulent procurement. The defendant prayed for damages arising from an illegal monopoly in violation of Section 2 of the Sherman Anti-Trust Act, 15 U.S.C. § 2. See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The district court found that the patent was invalid in view of the prior art and the doctrine of obviousness, and dismissed the complaint. Defendant's counterclaim was likewise dismissed since the court held there was no evidence that the plaintiffs were enforcing the patent with *knowledge* of fraudulent procurement. Acme Precision Products, Inc. v. American Alloys Corp., 347 F. Supp. 376 (W.D.Mo.1972). On appeal this court held the finding as to lack of knowledge clearly erroneous and reversed and remanded the case for a plenary trial. Acme Precision Products, Inc. v. American Alloys Corp., 422 F.2d 1395 (8th Cir. 1970).

We held that the knowledge of the plaintiffs as to the facts surrounding procurement of the patent was established as a matter of law. *Id.* at 1397. Similarly, in view of the interlocking structure and relationship of Acme and Jobbins II [1] and the role of C. V. Cooper, who until his death in 1960 served as President of Jobbins II, our prior decision held that the two corporations and

1. The factual history is fully set forth in our prior opinion, 422 F.2d at 1397.

their officers continued to enforce the patent with full knowledge of the events surrounding its issuance. *Id.* at 1398.

This court remanded the case to the district court with the remaining issues being (1) whether there was collusion in obtaining the Willmore '044 patent by concealing relevant facts as to the prior art and prior public use of the process from the patent office and (2) the existence of the other elements of a § 2 charge under the Sherman Act, i. e., the relevant market for the product involved, the dominant position of the party charged and damages, if any. *Id.* at 1400.

The district court found fraud in the procurement of the patent, as well as the fact of dominance by Acme and Jobbins II in a defined relevant market. However, the district court refused to award treble damages for lost sales since it found that American Alloys' loss of sales was not related to the alleged monoply or infringement suit. The court did award the defendant $75,260.51 trebled for attorneys' fees and costs in defending the infringement suit and $50,-000.00 for attorneys' fees and costs for prosecution of the antitrust counterclaim. American Alloys, as the counter-claimant, appeals from the denial of damages based on the alleged loss of sales, and the original plaintiffs, Acme and Jobbins II, who procured and enforced the patent, cross-appeal challenging the court's findings as to (1) proof of fraud, (2) the determination of the relevant market, (3) the dominance of plaintiffs in the market and (4) the award of attorneys' fees.

We find the district court erred in holding that the proof was sufficient to show that Acme and Jobbins II dominated a relevant market and thus monopolized or attempted to monopolize in violation of the antitrust laws. Thus, the trebling of the award for attorneys' fees and costs in defending the infringe-ment suit and the award of attorneys' fees and costs for prosecution of the antitrust counterclaim were erroneous. We do find sufficient evidence to support the district court's finding that there was fraud in the procurement and enforcement of the patent. Under these circumstances, it was within the discretion of the district court to award untrebled attorneys' fees for the expense of defending the patent infringement suit under 35 U.S.C. § 285.[2] Thus, we sustain only the award of $75,260.51 for defense of the infringement suit.

## FRAUD ON THE PATENT OFFICE

Although the district court made no specific findings relating to fraud it held that there was overwhelming evidence of fraud in the procurement of the patent. The court found that "the applicant concealed material facts as to prior art and commercial use" and made "deliberate misrepresentations . . . as to new art in limiting impurities." 347 F.Supp. at 378.

■■ Upon examination of the record we find sufficient evidence to support the trial court's conclusions as to fraud. In summary, the record shows that: (1) the Willmore patent application for Almag 35 was granted only after its claims were amended to limit impurities to 0.45%; yet the record is undisputed that Cooper's Almag was sold commercially as early as 1946 with less than 0.45% impurities; (2) William McKnight of Jobbins I supervised both the Cooper and Willmore patent applications; the record shows that Willmore met with Cooper's attorney to discuss the two applications with the hope of "salvaging one or more of these applications"; (3) there was close similarity in the beryllium content of both alloys; it was agreed that Cooper was the inventor of Almag 35 with a beryl-

2. Under 35 U.S.C. § 285 the court may allow reasonable attorneys' fees "in exceptional cases." Fraud on the patent office is an exceptional case. See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969).

We deem it inconsequential that the district court made the trebled award under § 15 of the Clayton Act, 15 U.S.C. § 15, rather than allowing only single damages under 35 U.S.C. § 285.

lium content of .05% and above; yet Willmore's patent application for Almag 35 claimed beryllium ranges at least as high as .07%; (4) Cooper's alloy had the same tensile strength, elongation and ductility as Almag 35; (5) Wayne Martin, plaintiffs' expert witness, testified that Willmore's application inaccurately described the state of the prior art; (6) Cooper received a royalty from the Willmore patent. The close relationship of the parties, more fully detailed in our earlier opinion, 422 F.2d at 1397, when considered with all the facts and circumstances surrounding the issuance of the patent, wherein the examiner granted the letters solely because of Willmore's limitation on impurities, lends strong support to the trial court's findings that the patent was obtained and enforced with knowledge of fraud on the patent office. As stated by the Court in Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945):

> "Those who have applications pending with the Patent Office . . . have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue."

## ANTITRUST LAWS: RELEVANT MARKET

■ Section 2 of the Sherman Act reads in part: "Every person who shall monopolize, or attempt to monopolize, . . . *any* part of the trade or commerce . . . ." (Our emphasis). Notwithstanding the implications of Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964), we hold that regardless of the particular charge, i. e., "monopolization" or "attempt to monopolize," proof of a relevant market is still a prerequisite for establishing a § 2 violation.

As stated so succinctly by the district court in Diamond International Corp. v.

Walterhoefer, 289 F.Supp. 550, 576–577 (D.Md.1968):

> "It seems to this court clear, both on authority and logic, that when a charge is made of attempt to monopolize, the first question would be—'to monopolize what?' The answer would seem to be 'the relevant market, toward the monopolization of which the attempt was directed.' Were this not so, there would be the anomaly that a defendant could be punished for attempting to do what, if accomplished, would be legal. That is, if a defendant in fact acquired a position in a relevant market that did not amount to monopoly, how could it be wrongful for a defendant to attempt, successfully or unsuccessfully to acquire that position—i. e., to try to do that which if accomplished would be valid?"

See also Agrashell, Inc. v. Hammons Products Co., 479 F.2d 269 (8th Cir. 1973).

The district court's finding relating to the relevant market is wanting for specificity of fact. The court simply states:

> "The relevant market was clearly shown. There was no substitute in existence for this high-strength aluminum alloy. Government specifications called for it. It seems obvious that the giant aluminum producers would not have paid the royalty if there were effective substitutes which did not infringe the patent." 347 F. Supp. at 378.

Undoubtedly one of the reasons for the lack of specificity in the district court's finding as to the relevant market is the noticeable absence of proof relating to the competitive structure within the aluminum alloy market.[3] American Alloys urges that it has defined the relevant market in its proof that Acme, the owner of the '044 patent on Almag 35, and Jobbins II, Acme's assignee, con-

---

3. Cf. United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The evidence in *duPont* relating to proof of dominance in a relevant market is detailed in Appendix A of the Court's opinion, 351 U.S. at 405–410, 76 S.Ct. 994.

trolled a unique market in which Amalloy, the alleged infringing alloy owned by American Alloys, provided the only competition.[4]

American Alloys urges that the low level of impurities in Almag 35 and Amalloy give these alloys greater critical strength and that this sets them apart from any other aluminum alloy on the market. It is thus contended that Almag 35 clearly dominates the "relevant market" by controlling more than 70% of the Almag 35-Amalloy market.[5]

The United States Supreme Court's decision in United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), provides the basic guidelines for determining the relevant market under the Sherman Act. DuPont was charged with monopolizing interstate commerce in cellophane. DuPont produced almost 75% of the cellophane sold in the United States. However, the Supreme Court held that the relevant market for determining whether duPont had monopolized trade consisted of all flexible packaging materials, rather than cellophane alone. The evidence showed that duPont produced only 17.9% of all flexible packaging materials sold in the United States.

■■ Although determination of the relevant market is essentially a fact question, see, e.g., United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), and United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); ABA Antitrust Section, Antitrust Developments: 1958–1968 at 25 (1968), nevertheless there are certain legal guidelines applicable to all cases. The duPont test summarized by the Supreme Court is simply stated:

"The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." DuPont, supra at 404, 76 S.Ct. at 1012.

Throughout the opinion, the Court made it clear that the availability of reasonable substitutes was the significant factor:

"Every manufacturer is the sole producer of the particular commodity it makes but its control in the above sense of the relevant market depends upon the availability of alternative commodities for buyers: i. e., whether there is a cross-elasticity of demand between cellophane and the other wrappings. This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." DuPont, supra at 380–381, 76 S.Ct. at 999.

"The varying circumstances of each case determine the results. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." DuPont, supra at 395, 76 S.Ct. at 1007.

When one considers the obvious differences between cellophane and other

4. The sales area for Amalloy was described as "roughly . . . through the Ohio Valley, in Wisconsin and up through Toledo, Ohio, Detroit; it takes in Wisconsin, Minnesota, Iowa, Nebraska, Illinois, Missouri, Texas, Oklahoma, Arkansas, Louisiana, Indiana." American Alloys' proof as to the geographic sales area of Jobbins II and Acme, as well as

Reynolds, Olin, Alcoa, Alcan and "secondary smelters" was only that they covered "a wider area" of the United States.

5. This includes the total sales made by Acme, Jobbins II and all of Jobbins II's licensees. Plaintiffs alone sold 44.6% of the Almag 35-Amalloy market.

packaging materials, for example, tin foil or saran wrap, it is evident that the Court did not intend to limit the substitution test to fungible goods. "What was important was interchangeability in end use. Of course, the more similar a product is in appearance or use, the better the chance of its being included as a substitute." Hampton & Hibner, Horizontal Restraints of Trade—The Sherman Act, in Antitrust Advisor 57 (C. Hills ed. 1971).

Nevertheless, application of the test often produces varying results. For example, in International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), the Supreme Court concluded that championship boxing matches constituted the "cream" of the boxing business, and were a sufficiently separate part of trade or commerce to constitute the relevant market.[6] See also United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

It is clear that every case requires an *ad hoc* determination of the relevant market. As the court said in Diamond International Corp. v. Walterhoefer, 289 F.Supp. 550, 577 (D.Md.1968), "[t]he decided cases give no real help for an a priori determination of interchangeability."

■■ The burden of proof as to the relevant market and plaintiffs' alleged illegal domination of it rests on the claimant, American Alloys. See, e.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177–178, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and *duPont*, supra 351 U.S. at 381, 76 S.Ct. 994. American Alloys' proof, as indicated, is simply that other alloys are not competitive with its Amalloy and Almag 35. The record does not sustain this contention. The evidence produced by plaintiffs is that there is a large market demand for alloys, known as 218, which possess similar characteristics and are used for similar purposes. There are certain differences between the 218 alloys and Almag 35-Amalloy alloys. The A–218 alloy, produced by Olin and Alcoa, omits beryllium, the B–218 alloy produced by Alcoa, does not contain manganese and the Reynolds B–218 alloy omits titanium. However, the only fundamental consequence of these differences appears to be that the critical yield strength of Almag 35 and supposedly Amalloy is greater. In all other respects the alloys are identical. They all possess the same tensile strength and each has the same elongation and ductility. Moreover, as will be discussed, the record is undisputed that the various alloys are interchangeable in 95% of their applications. The only other proof offered by American Alloys is that the 218 alloys are "cheaper." The record is totally silent as to how much cheaper or as to what effect the price differential has on the market involved.[7]

6. The facts upon which this conclusion was based were set out in the opinion:

"[T]he average revenue from all sources for appellants' championship bouts was $154,000, compared to $40,000 for their nonchampionship programs; that television rights to one championship fight brought $100,000, in contrast to $45,000 for a nontitle fight seven months later between the same two fighters; that the average 'Nielsen' ratings over a two-and-one-half-year period were 74.9% for appellants' championship contests, and 57.7% for their nonchampionship programs (reflecting a difference of several million viewers between the two types of fights); that although the revenues from movie rights for six of appellants' championship bouts totaled over $600,000, no full-length motion picture rights were sold for a non-championship contest; and that spectators pay 'substantially more' for tickets to championship fights than for nontitle fights. In addition, numerous representatives of the broadcasting, motion picture and advertising industries testified to the general effect that a 'particular and special demand exists among radio broadcasting and telecasting [and motion picture] companies for the rights to broadcast and telecast [and make and distribute films of] championship contests in contradistinction to similar rights to non-championship contests.'" *International Boxing Club*, supra at 250–251, 79 S.Ct. at 250.

7. Although price is certainly an important factor in determining the interchangeability of products, it is not the sole consideration. In

The difficulty with the present record is the overwhelming evidence demonstrating that Almag 35 and Amalloy are in substantial competition with the 218 alloys.[8] Plaintiffs proved that the only specifications calling for the higher yield strength of Almag 35 come from the Atomic Energy Commission and the military.[9] According to plaintiffs' expert witness this amounts to only 5% of the total demand on all the companies which sell Almag 35, Amalloy and all other competitive aluminum alloys.[10]

This evidence was corroborated by the President of American Alloys, John Clay. He testified that 218 alloys and Almag 35-Amalloy alloys were suitable for many of the same applications. There is additional evidence that many of the sales American Alloys claims it lost to sales of Almag 35 by Jobbins II and its licensees were in fact lost to the 218 alloys.

It is difficult to restrict the market to Almag 35 and Amalloy in light of Mr. Clay's testimony. Mr. Clay was asked:

"Q. What other alloys are available on the market today or have been in the past few years that serve the same purpose or can be used for the same applications as Almag 35 and Amalloy? A. Well, I think 218. You have to qualify that, Mr. Scott. You are talking about 218. There is an A–218, B–218 and you will find that some of these, particularly the Alcoa 218, is very close to either Almag or Amalloy, and I think—

"Q. For many applications, at least, it could be used? A. That is right.

"Q. I think you mentioned that you sold Amalloy in competition with some alloy that was made by Aluminum and Magnesium in your direct examination. A. I believe we have, I don't know the number of it, but I am sure that they made one.

"Q. But you can't recall that particular alloy? A. No.

"Q. It was suitable for use in some applications for which Amalloy is substituted, is that right? A. Yes, that's right, and I think that U.S. Reduction had a Magalloy that was in the range of Amalloy or Almag, I am sure they did.

"Q. So that was another one that sometime during this period was competitive with Amalloy and Almag 35? A. Yes."

---

*duPont*, the Supreme Court noted the existence of price differentials between cellophane and other flexible packaging materials. However, these were not deemed significant enough to make cellophane the relevant market. *Du-Pont*, supra at 396, 76 S.Ct. 994. In Bendix Corp. v. Balax, Inc., 471 F.2d 149 (7th Cir. 1972), the Seventh Circuit held that swaging taps, which cost twice as much as cutting taps, were in the same market as cutting taps.

8. Plaintiffs' expert, Wayne Martin, testified:
"Q. Is that alloy being sold today in competition with Almag 35? A. Yes, in quite substantial quantities.
"Q. For what applications? A. Any place where somebody feels they can do just as well without quite such a high yield strength, and there are many applications where this applies. The percentage elongation, the tensile strength is practically the same. So where critical yield strength is not important, somebody could use this alloy and get along all right. Now, the Reynolds Metals Company, they are selling one. I think theirs is called A–218, and it is ex-

tremely similar to Almag which William F. Jobbins sells. Their titanium is slightly low.
"Q. And is that also being sold in competition with Almag 35 today? A. Yes, in quite sizable quantities. They take business. Both of these firms have taken a substantial amount of business away from us with these two alloys."

9. Ironically, the evidence shows that defendant's Amalloy could not meet the higher specifications of the Atomic Energy Commission and the military. Under the evidence it would appear only Almag 35 qualified for this specialized market.

10. In Bendix Corp. v. Balax, Inc., 471 F.2d 149 (7th Cir. 1972), the court held that swaging taps and cutting taps were in the same relevant market. The court found reasonable interchangeability between the two products despite the cost differential. The court relied upon the fact that swaging taps were reasonably interchangeable with approximately 50% of the cutting tap market.

We find that the relevant market is much broader than that urged by defendant. Defendant urges that Almag 35 and Amalloy are the "cream" of the market as shown by plaintiffs' patent and plaintiffs' own advertising. But this argument is not convincing in view of the overall record of competitive interchangeability of all alloys marketed. As stated by the Supreme Court in *du-Pont*:

"But where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market. To accept the Government's argument, we would have to conclude that the manufacturers of plain as well as moistureproof cellophane were monopolists, and so with films such as Pliofilm, foil, glassine, polyethylene, and Saran, for each of these wrapping materials is distinguishable." *DuPont*, supra, 351 U.S. at 394, 76 S.Ct. at 1006.

■ The argument that buyers would not pay the royalties for Almag 35 if it did not constitute a separate market is unconvincing. Use of a specific product turns on many variables determined by the individual preferences of the specific buyer. Thus, as in *duPont*, buyers may prefer cellophane because of its alleged superior qualities over some other flexible wrapper and be willing to pay a higher price.[11] Yet this does not of itself place cellophane in a separate market. The "end use" of a product has a greater influence on the determination of "cross-elasticity" than the higher price of a more desirable product.

11. As the Supreme Court indicated in *duPont*, "cellophane combines the desirable elements of transparency, strength and cheapness more definitely than any of the others." *DuPont*, supra at 398, 76 S.Ct. at 1009. Yet the district court found that:
    "132. The price of cellophane is today an obstacle to its sales in competition with other flexible packaging materials.

 We conclude that the overall proof is grossly deficient in showing the extent of the relevant market and plaintiffs' domination of it. The evidence clearly demonstrates that the relevant market includes more alloys than Almag 35 and Amalloy. The district court did not award damages for lost sales. In view of our finding we need not pass on this issue. The finding that American Alloys is entitled to attorneys' fees under the Clayton Act is reversed; defendant is allowed attorneys' fees under 35 U.S.C. § 285 for the defense of the infringement suit.

Judgment reversed and remanded for entry of judgment in the sum of $75,-260.51 for attorneys' fees and costs.

"133. Cellophane has alway been higher priced than the two largest selling flexible packaging materials, wax paper and glassine, and this has represented a disadvantage to sales of cellophane." *Id.* at n. 29.